**WURZBURGER HOFBRAU AKTIENGE-
SELLSCHAFT et al., Plaintiffs,**

v.

**SCHOENLING BREWING CO., Inc.,
Defendant.**

**Civ. A. No. 6411.**

United States District Court,
S. D. Ohio, W. D.

March 12, 1971.

Thomas S. Calder, Dinsmore, Shohl,
Coates & Deupree, Lawrence R. Elleman,
Cincinnati, Ohio, for plaintiffs.

Roy F. Schaeperklaus, Cincinnati, Ohio, for defendant.

## DECISION

HOGAN, District Judge.

This is a trademark infringement action and an unfair competition action (which arises in connection with an infringement action of substance; for that reason and for the further reason that diversity and amount in controversy are present and involved, this Court has jurisdiction).

There are two plaintiffs. The first, Wurzburger Hofbrau A. G. (hereinafter "WH"), is a German corporation which produces beer at its brewery in Wurzburg, Bavaria. For many years the distribution of its product has included export to the United States. The other plaintiff, Original Beer Importing & Distributing Co., Inc. (hereinafter "OBI"), a New York corporation, is and has been, at least for the past 20 years, the exclusive United States importer of the beer of the German plaintiff. Unless the context requires more specificality, the two will be referred to as a unitary plaintiff.

The defendant Schoenling Brewing Co. is an Ohio corporation. Its brewery is in Cincinnati, Ohio, and its product is and has been for many years delivered principally in the Ohio-Kentucky-Indiana circle.

In 1933, the plaintiff obtained and in 1953 renewed, on the Principal Register, United States Trademark 308,999. It consisted of a design which included a castle, a star, a crown and the words, "Wurzburger Hofbrau." The character of the lettering was more English than German, although the German umlaut was present. The registration specifically disclaimed the words, "Wurzburger Hofbrau" except in association with the other features of the mark. The registration was "for beer."

Section 6 of the Lanham Act specifically provides:

"No disclaimer * * * shall prejudice or affect the * * * registrant's rights * * * thereafter arising in the disclaimed matter, or his right of registration on another application if the disclaimed matter be or shall have become distinctive of his goods or services."

While the first trademark appears in this case as a matter of pleading, it is really not involved since there is no question that the defendant has not infringed upon it.

In 1960, the plaintiff registered, again on the Principal Register, the trademark "Wurzburger Hofbrau." The date of the registration is March 16, 1960, and the number is 694,650. Again the registration was "for beer." The lettering characteristics were distinctly German, again including the umlaut in the two appropriate places over the first "u" in Wurzburger and over the "a" in Hofbrau. While, as we shall see, the defendant has used the word "Wurzburger" in its labeling and advertising, it has never used the word "Hofbrau."

In 1964 the plaintiff applied to the Patent Office for a registration of the trademark "Wurzburger" (in German characters and with the umlaut). The mark was finally registered in January of 1967 on the Principal Register for beer. In the application it was stated that this trademark was first used as early as 1858 in association with the term "Hofbrau"; that it had been used in foreign commerce with the United States in that association since 1887; and that it had been used alone as a trademark in commerce with and in the United States since May of 1961. Since, beginning in approximately 1962, the defendant has used the words "Old Wurzburger" (in German characters and also with the umlaut) in its labeling and advertising, this third trademark is certainly and most directly involved in the infringement portion of this case.

Wurzburg is, of course, a town in Bavaria. There are two breweries there which have been brewing beer for probably centuries. The beer of the plaintiff brewery has alway been labeled "Wurzburger Hofbrau," insofar as German

domestic consumption is concerned; and until the middle 60's, those words have always appeared both on the labels and on the product distributed in this country. The other Wurzburg brewery is known as "Wurzburger Burgerbrau A. G." and its product is known and labeled as "Wurzburger Burgerbrau." At one time that company obtained a trademark in the United States—"Wurzburger Burgerbrau"—and there is some suggestion in this record that at one time its product was imported into and distributed in the United States. If there was any distribution, it was too insignificant to be of any consequence here.

Except during the war periods and prohibition, Wurzburger Hofbrau beer has been imported into and sold in various of the United States in substantial quantities for close to 100 years. Of recent years it has been marketed in some 38 states through distributors or representatives of the plaintiff. Sales since 1950 under the second and third trademarks, i. e., "Wurzburger Hofbrau" and "Wurzburger" have totaled about $25 million. While in 1950 these sales amounted to a gross of something in the neighborhood of $110,000.00, by 1960 the gross exceeded one and a half million dollars. Through the period the plaintiff's advertisings of its product under either of the names have included, of course, not only the advertising obtained from its own labeling and package markings, but also various point of sale items— such as one normally sees in connection with beer in restaurants, bars, etc. (neon signs, table markers, menus, etc.). In addition, there has been advertising of the product in a number of newspapers and magazines, some of which have national distribution. As of 1962, there is no question that the plaintiff had invested a substantial amount[1] in the name "Wurzburger" and/or the name "Wurzburger Hofbrau" and that either of those names was, in the mind of the beer consuming public, associated with the product of the plaintiff. At least at the time of the commencement of the actions of the defendant complained of in this case, the defendant had no investment whatever in the name "Wurzburger."

The plaintiff's beer is known for its quality. It is one of the four or five better selling foreign imports. As a rule of thumb, all foreign beer imports in the United States represents only about .7% of consumption. To whatever import geography rises in this case, the fact is that all of the plaintiff's beer which has been distributed in the United States has been made or brewed in Wurzburg. The Bavarian laws regulating beer production require the use of certain described ingredients in exclusivity and regulate at least a certain part of the brewing process. United States requirements, state and/or federal, are not as stringent. Beers imported from Bavaria or West Germany are preferred by a substantial number of consumers in the United States and that is true whether the beers be brewed in Munich or Wurzburg, or where have you. These German beers, including those of the plaintiff, have consistently sold at a price in excess of the price for domestic beers.

One thing this case does not have particular concern with is Wurzburger, from either a geographic or a characteristic or a generic point of view prior to World War I. Evidently prior to that time not only was the plaintiff's product distributed in the United States, but in this, that or the other various portions of the United States various domestic brewers used the word "Wurzburger" in labeling their product either in whole or in part. In fact, around the turn of the century someone wrote a song under the title of, "Down Where the Wurzburger Flows." Whatever the word signified in American usage before the First War and prohibition probably was reflected to some extent in an action of the United States Federal labeling authority (The Alcohol Tax Unit) taken shortly

---

[1]. In the past 20 years, plaintiffs have expended between $1,500,000 and $2,000,000 in advertising, in all forms, "Wurzburger Hofbrau" and "Wurzburger" beer.

after repeal. The A.T.U. was interested in promulgating some general regulations governing labeling to prevent confusion or misleading labeling. The regulation then promulgated, which has remained in force to this day, is 27 C.F.R. 7.24(e), which provides:

"Geographical names for distinctive types of malt beverages (other than names found by the Director under paragraph (f) of this section to have become generic) shall not be applied to malt beverages produced in any place other than the particular region indicated by the name unless (1) in direct conjunction with the name there appears the word 'type' or the word 'American,' or some other statement indicating the true place of production in lettering substantially as conspicuous as such name, and (2) the malt beverages to which the name is applied conform to the type so designated. The following are examples of distinctive types of beer with geographical names that have not become generic: Dortmund, Dortmunder, Vienna, Wein, Weiner, Bavarian, Munich, Munchner, Salvator, Kulmbacher, Wurtzburger, Pilsen; Provided, that notwithstanding the foregoing provisions of this section, beer which is produced in the United States may be designated as 'Pilsen,' 'Pilsener,' or 'Pilsner' without further modification, if it conforms to such type."

One of the contentions of the defendant in this case is that this regulation demonstrates that "Wurzburger" is simply a geographical name for a distinctive type of malt beverage—the contention being that the descriptive name of a thing and/or a geographical name may not be the proper subject of a trademark. In fact, the defendant goes further and claims that the literacy of the A.T.U. in a labeling regulation is binding on a court in an infringement case.

At the times of interest here, the plaintiff distributed about $15,000 worth of its product in a year in the area in which Schoenling beer is distributed.

In the middle 50's Schoenling began experimenting with an intention of developing and marketing a product intended to be heavier and darker than regular lager (American) beer, but similar in appearance to Central European beers. Two things happened close enough to 1960 to consider as concomitant. One of them is that "Wurzburger Hofbrau" (with or without the umlaut) is an awfully long name for the a la '60 American public. As a consequence, the American consumer had begun to shorten it to "Wurzburger." In recognition of that bars and restaurants did the same shortening on their menus. Insofar as this record is concerned, there is not much doubt that, with the possible exception of a small area in Pennsylvania and the more probable exception of approximately $\frac{1}{10}$th of the Florida East Coast Golden Strip and a small locality in Massachusetts, the word "Wurzburger"— used by a member of the American consuming public in connection with beer or used by the dispensing public—meant "Wurzburger Hofbrau," i. e., that beer produced in Wurzburg, Germany. In recognition of that, the plaintiff at about that time, i. e., 1960, shortened one of its bottle labels. The front label was still in the long form. The back label prominently identified the content simply as "Wurzburger."

The total sales figures of the plaintiff, as well as the advertising figures, are small compared to even a large local brewery; however, it must be remembered that the "consuming public" vis-a-vis imports is smaller than the consuming public vis-a-vis domestic premiums and very, very small compared to the aggregate of the domestic non-premiums. One of the cogent reasons for that is price—the imported beer to the consumer bought at a retail establishment is just about double what a domestic local beer is, with the domestic premium being much closer in price to the local than the imported. To take one specific example which is representative—the cost of the domestic local item would be 45 cents, the premium 55 cents and the import 85

cents. In this light, the plaintiff's efforts in the development of knowledge of its product—salewise and advertising-wise—has been substantial. On this record, and at least prior to 1962, no one else had any substantial investment cost at all in the development of sales for any kind of Wurzburger beer that carried over to that time; also on this record—both before and after 1960—no one else (other than the plaintiff) ever has had any substantial history of selling any beer made in Wurzburg, nor has anyone expended a dime to promote the sale of any beer made in that town.

In 1967, when the third trademark was obtained, the plaintiff dropped the word "Hofbrau" from is front label so that since that time it has advertised and distributed its beer only as Wurzburger. This action in point of time about coincided with the commencement of this lawsuit.

By the early 1960's, the defendant had developed the beer which it wanted to develop and on which it began to experiment in the middle 50's. It then attacked the problem of giving it a name. The name finally determined upon was, of course, "Old Wurzburger"—spelled in German style letters, including the umlaut. It is of some import to note that the defendant did not set out to develop any particular type of beer as a new product—it set out simply to develop a beer which could be sold for some higher price than its domestic production and which would have some of the characteristics of imported beer. Another way of saying it is that it started out to develop a beer which could be described as styled after an import. The brewmaster who did the developing suggested the names that could be used for the new beer. He suggested not only "Wurzburger", but also "Munchner," "Kulmbacher," and "Bavarian." A great deal of this record is occupied with evidence pro and con on the question whether "Wurzburger" beer is a distinctive type of beer—the defense claim being that it

is and that therefore that name is merely descriptive of the article and cannot be trademarked. In this Court's view, any question connected therewith remains, on this record, simply abstract or ideological. That same item of evidence disposes, if any disposition be needed, of the applicability of the Alcohol Tax Unit regulation. Whatever may have been the fact situation before the First War or after Repeal, the defendant's action, through its brewmaster, speaks pretty loudly to the effect that there is no such thing, as such, as a "Wurzburger" kind or class or type of beer. If it were, how could one item fall into all of the various classifications described in the A.T.U. regulation as "distinctive types." 1933 —perhaps yes; 1960—on this record, no.

It is a fact finding of this Court that, on this record, the word "Wurzburger," in connection with beer, does not mean a distinctive type of beer, i. e., a beer different from "Dortmund," or "Dortmunder," or "Bavarian," or "Munich," etc.

Having developed the new product and named it, the defendant began to distribute it in Southwestern Ohio and Northern Kentucky and adjacent areas. The distribution involved labeling, of course, and the general labeling and advertising of the defendant was of "Old Wurzburger type beer." The "Old" and the "Wurzburger" were in German lettering. The "type" and the "beer" were in English lettering about half as big as "Wurzburger." On the labels and the advertising, in lettering that would strain the reader's eyes, appeared "The Schoenling Brewing Company"; the address "Cincinnati, Ohio" was reminiscent of the last line in the oculist's office. The defendant at the time was familiar with the existence of plaintiff's product and its method of advertising. It[2] was designed to permit the retail purveyor to give an impression of the distribution of an imported product called "Wurzburger." And this the retail purveyors did. Menus were used in various retail establishments in the area which simply re-

---

2. i. e., the defendant's labeling and advertising.

**502**

ferred to the availability of "Wurzburger" under the general heading of beer. In some places the item served was the import and in other places the item served was the defendant's product. It did in fact cause confusion. To take an extreme case—the defendant's product was limited to draft beer; the plaintiff's included both draft and bottled. In one establishment if you asked for "Wurzburger" draft, you got the defendant's product; and if you asked for "Wurzburger" bottled, you got the plaintiff's product. While the defendant's product cost only about 60 cents a barrel more to produce than its ordinary beer, it obtained a price from the retailer or distributor of several dollars higher. This left the barrel price of the defendant's product considerably less than the price of the plaintiff's, as a result of which the plaintiff lost several of its dealers in the area because of the inability to meet the price competition.

The second and third registrations were based on Section 2(f) of the Trademark Act of 1946 (15 U.S.C. § 1052(f)) on a showing and a finding by the Patent Office that the trademarks had become distinctive as applied to plaintiff's goods in commerce. The plaintiff's use of the word "Wurzburger" as its trademark for beer sold in the United States has been substantially exclusive since 1946. There have been occasional uses of that word in conjunction with type or style. They have been minor and/or of a local nature and for the most part ceased prior to 1946 except as noted below.

On this record, the word "Wurzburger" has not been used at any time in the defendant's market area for beer other than by the parties to this case. At the present time there is only one current use of the word in any other part of the country.

The marks "Wurzburger" and "Wurzburger Hofbrau" have acquired a secondary meaning in the United States and in the Cincinnati marketing area— identifying the product of the plaintiff. In the mind of the consumer of the imported beer, the words "Wurzburger" and "Wurzburger Hofbrau" mean the product of the plaintiff. The plaintiff historically has and still does make beers which look different at least. One of its beers is called a light beer, another is called a dark beer; there is a product called October beer; in addition, there is a Bock beer. The defendant's "Old Wurzburger" beer is brewed differently and with different ingredients than beers which have originated in Wurzburg, Germany.

The defendant has raised a number of technical objections to the registration proceedings involved in one or the other of the marks (e. g., the application was signed by a person not authorized under German law; the submitted labels were defective) and has also, both defensewise and counterclaimwise, raised the issue of whether or not the marks, or one or the other of them, were not obtained by fraud. The technical objections are without merit. Some of the fraud objections are likewise without merit. For instance, it is claimed that the applicant did not inform the Patent Office examiner that there were two breweries in Wurzburg; did not inform the examiner that the A.T.U. had acted on the subject in the early 30's, etc. Since these items and others like them were known to the examiner, as revealed in the file wrapper itself, no fact finding is required with respect to them. There is only one fraud item which need be spelled out. Both the second and third marks were issued under 2(f) (15 U.S.C. § 1052) which permits the registration of either a "merely descriptive" or "geographically descriptive" mark if, by reason of its use by the applicant it has "become distinctive of the applicant's use in commerce." The section then continues:

" * * * The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the

five years next preceding the date of the filing of the application for its registration."

In 1960, a brewery in Massachusetts, Hampden-Harvard, was making a "Wurzburger" type beer. In October of 1960, the plaintiff demanded that this brewery discontinue the use of that word and the brewery decided to do so and did cease the use. The reason given was that it could not economically afford to get into a fight about it. Again in 1961, the plaintiff discovered that the West End Brewery of Utica, New York, was marketing a beer under the label "Utica Club Wurzburger type beer." Insofar as this record is concerned, the market was limited to Southeast Florida. The plaintiff, in 1961, demanded that West End cease using the Wurzburger name. The demand was not successful and it is a fair inference that the plaintiff knew that West End had not stopped. In 1964 and thereafter, while the plaintiff was prosecuting the application for the third mark, it represented that its use of the word was exclusive and failed to inform the Patent Office of either the Hampden-Harvard matter or the West End matter or the status of either.

There is no showing in this record that the plaintiffs have in any way combined with themselves or others to obtain any monopoly or to violate any of the antitrust laws. The defendant has made no effort to import beer from anyplace and on this record no one has ever made any effort in the past 25 years to import any beer from Wurzburg.

The sole evidence adduced by the defendant relative to any antitrust activity on the part of the plaintiffs is that the plaintiffs have, of recent years, threatened litigation against the only three entities who (in the last 25 years) have endeavored to use the word "Wurzburger" in connection with marketing beer.

The law questions in this case have been substantially put to rest in this Circuit by Anheuser-Busch v. Bavarian Brewing Co., 264 F.2d 88 (6th, 1959). That case involved the Lanham Act, a contention that Bavarian's registration was invalid because of fraud, etc. Bavarian's distributing area was the same area as is Schoenling's here. Anheuser-Busch did not compete in that territory, but contemplated doing so. The plaintiff brought suit alleging itself to be the owner of the registered mark "Bavarian's," charging the defendant with proposed trademark infringement and unfair competition. As in this case, the defendant's counterclaim urged cancellation of the mark, raising the descriptive and geographical objections, and fraud in obtaining the mark. The Court pointed out that over a span of about 20 years Bavarian had used that name exclusively for its product in the area involved, labeled its beer with the name "Bavarian's" and further that it had registered the mark under the trademark laws. Except from a point of view of amount or degree, the case corresponds with this one from the point of view of sales and advertising over a long period of time. The Court said:

"The principal defense is that the term 'Bavarian' is only descriptive of a type of beer and, so, not entitled to trademark protection. The plaintiff, in response, relies upon the Lanham Act and evidence that it had developed a secondary meaning for its mark by reason of its use thereof continuously since 1946. * * * It is sufficient to say that the Bavarian Company was able to satisfy the Patent Office that it had title to the marks under the law of the States which comprised its distribution area. Registration is prima facie evidence of ownership and we must accept it, unless we find it necessary to decree the cancellation of the mark upon the ground that it was obtained by fraud, that Bavarian is not entitled to its sole use upon the principle of estoppel, or that the evidence discloses it to be a term merely descriptive without secondary meaning as to the source of the product, so labeled, in its distribution area.

"It may well be conceded that the term 'Bavarian,' or its possessive 'Ba-

varian's,' are descriptive of a type or style of beer in other territory, and that it had such single connotation in earlier stages of the industry. This does not decide, however, whether the product of the plaintiff, by long usage and acceptance by the public in its own field, has acquired a secondary meaning indicating its source. \* \* \*

"It is to be observed that the plaintiff has used the label 'Bavarian's' for many years, more than the minimum required by the above Section (2(f)) \* \* \*. To this, must be added evidence of a survey which showed that [7/11ths of 1000 people interviewed] related the term 'Bavarian' to beer made in the Cincinnati area \* \* \*."

Parenthetically, the evidence in this case is uncontradicted that, to purveyors of beer and consumers of beer, the word "Wurzburger" associated with beer means the product of the plaintiff.

To return to the Bavarian opinion—

"The defendant challenged this proof by the testimony of persons in the brewing industry to the effect that 'Bavarian' meant a type or style of beer but we are mainly concerned here with what the term means to consumers of beer. \* \* \* Since the trial Judge concluded that plaintiff had shown secondary meaning on the basis of substantial evidence, we may not set it aside as clearly erroneous. \* \* \*

" \* \* \* the injunction herein may be valid when a secondary meaning has been acquired by the plaintiff for its product under Federal law \* \* \*

"The defendant's contention is that there was fraud in the alleged affidavits used by the plaintiff, in proof of distinctiveness, or secondary meaning, \* \* \* Fraud is not lightly to be presumed and we agree with the trial Court that the facts do not constitute fraud. A second claim of fraud rests on proof that the plaintiff's secretary made a knowingly false affidavit to the Patent Office to the effect that no other person, firm, corporation, or association, to the best of his knowledge or belief, has the right to use a trademark in commerce which may lawfully be regulated by Congress, either in the identical form thereof or in such near resemblance thereto as might be calculated to deceive, when he knew that the Mount Carbon Brewery of Pottsville, Pa., used the label 'Bavarian Style Premium Beer.' We believe it to be a fair inference from the evidence that plaintiff's secretary swore to the Patent Office that no one else uses the term 'Bavarian' as a mark. \* \* \* Whatever may have been the circumstances in which Mount Carbon Brewery used the Bavarian label, it has no bearing upon the existence or absence of a secondary meaning in the limited market area of the plaintiff.

" \* \* \* Rights under Section 2(f) of the Lanham Act could be acquired since 1946, and the conclusion that such rights had been acquired by the plaintiff since 1946 is inescapable. There is substantial evidence that in the plaintiff's distributing area 'Bavarian' or 'Bavarian's' is distinctive of plaintiff's product. \* \* \*

"The Lanham Act creating rights acquired by secondary meaning marks appears to leave a wide discretion in the courts in determining what is fair competition. In areas where there has been no showing that plaintiff has achieved a secondary meaning for the term 'Bavarian' and so is not likely to cause confusion, it may be used fairly by others. \* \* \* With regard to registered secondary meaning, the Act is sufficiently broad to protect a mark which had acquired a secondary meaning in the users market. \* \* \* "

And so, in this case, there is no contradiction in this record that in the Cincinnati marketing area, a la 1962, "Wurzburger" in connection with beer had acquired a secondary meaning in the mind of the consuming public and meant the plaintiff's product.

15 U.S.C. § 1057(b) provides:

"A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate."

The presumption of validity has been held to be a strong one. In Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp., 259 F.2d 314 (2nd, 1958), the Court said:

" * * * Congress made it clear that weight should be accorded to the actions of the Patent Office. * * * [15 U.S.C. § 1057] means not only that the burden of going forward is upon the contestant of the registration but that there is a strong presumption of validity so that the party claiming invalidity has the burden of proof and in order to prevail it must put something more into the scales than the registrant. * * *

" * * * It may well be that the many differing and irreconcilable views of the courts was one of the reasons which impelled Congress to write into the 1946 Act the presumption of validity from registration. At any rate nothing could be clearer than the fact that prior decisions were of little help, and that there was a need to give to the imprimatur of the Patent Office some real value."

The Sixth Circuit has not passed on the burden of proof question. The sole District Court in this Circuit to consider it followed the Second Circuit. See Tigrett Industries, Inc. v. Top Value Enterprises, 217 F.Supp. 313 (D.C.Tenn., 1963). Whether the defendant's burden be one of proof or of counteracting a presumption, the defendant simply did not satisfy either. While there was evidence of the existence of the word "Wurzburger" in a great many trademarks mainly concerning other products, there was no evidence at all of any user of such other marks—certainly none at all of any user in the defendant's marketing area. Even assuming that the substantial exclusivity language of 2(f), when coupled with such cases as Precision Instrument Mfg. Co. v. Automotive, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Schwartz v. F.T.C., 289 F.2d 665 (3rd, 1961); and Walker Process Equipment, Inc. v. Food Machinery, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) would require an applicant in a 2(f) proceeding to make some disclosures of the use by other persons; nonetheless the specific requirement of the statute (15 U.S.C. § 1051) is not a disclosure of use, but a disclosure of use by those having "the right to use" and more importantly (a) with respect to the Massachusetts Brewery— the use had stopped, and (b) with respect to West End—the actual use was considerably different. West End was not purporting to be producing "Wurzburger" beer, nor was it in any way representing that the beer which it was selling was imported. West End, in its labeling, held out to the public that it was selling not Wurzburger beer but Utica Club beer and that was in the biggest print—in somewhat smaller print the product was described as a Wurzburger style of beer. And finally, the labeling stated clearly that the product had been brewed by the West End Brewing Company at Utica, New York. The Utica Club label was quite consistent with the statement that somebody else is making the real thing and we are making an imitation.

This Court is not setting out to decide any litigation which may occur between Utica and the plaintiff. This Court is confronted merely with a question of whether or not the failure to disclose the Utica Club use of the word "Wurzburger" to the Patent Office amounted to a fraud. In that sense that Utica Club matter was insubstantial and immaterial; so was the plaintiff's failure to disclose the uses of the word by other breweries and the uses of the word by producers of other products. There

was a substantial amount of that type of evidence in the Bavarian case, as one gathers from reading the briefs in it. Substantial exclusivity is a relative term. It is true that a mark cannot become distinctive of the goods of one seller in a particular area if the same mark is being used by others in the same location to such an extent that the public is as likely to associate the mark with other sellers as with the party claiming distinctiveness. Certainly one hundred percent exclusivity is not required. Nor does the search extend to other marketing areas, earlier years or non-competing goods. See *Anheuser-Busch*, supra; Atlas Supply Co. v. Atlas Brake Shops Inc., 360 F.2d 16 (6th, 1966); National Lead Co. v. Wolfe, 223 F.2d 195 (9th, 1955); Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th, 1963).

■ Each of the second and third marks (694,650 in 1960 for "Wurzburger Hofbrau" and 822,509 in 1967 for "Wurzburger") is a valid mark as applied to beer. Whatever the name "Wurzburger" meant in the brewing industry prior to 1936, at least by 1960 the word, insofar as the plaintiff's product was concerned, had acquired a secondary meaning—being the beer product of the plaintiff. Each mark was infringed upon by the actions of the defendant subsequent to 1962. In addition, the defendant must be held responsible not only for its own action in relation to the name or mark, but also for the action of its retailers. It was quite foreseeable that retailers would use the product in an infringing manner, as many did. In the language of Stix Products, Inc. v. United Merchants, 295 F.Supp. 479 (D.C. New York, 1968), defendant "supplied the ammunition to the retailers; the retailers fired the shots."

■ Under the common law of Ohio, one acquires a common law mark via the substantial use of a name for a product in a given area. If that substantial use is followed by another's use of a name so similar that confusion in identity might result, it is unfair com-petition and the appropriate subject of an injunction—the question of import in Ohio is one of substantiality of use by a plaintiff of a given name to the extent that the use of that name by another person associates the product or services of the other person with the plaintiff. Ohio has a policy against "reaping where one has not sown." And in proper cases the Ohio courts grant an injunction to the rightful user of a trade name—even if the trader is in a non-competing field. See National City Bank of Cleveland v. National City Window Cleaning Co., 174 Ohio St. 510, 190 N.E.2d 437 (1963).

By virtue of its at least ten years' use in exclusivity in the Cincinnati area of the names involved in the second and third marks, the plaintiff had acquired a common law right in such names in connection with beer, which common law rights have been infringed by the defendant.

At least in this Circuit, the Alcohol Tax Unit regulation is not only not determinative, but is more historical than anything else. As we have noted, this regulation dealt with the word "Bavarian" as well as with the word "Wurzburger" and placed each word in the same category as of the 1930's of "geographical—non-generic." In the *Bavarian* case, the argument made by the defendant in this case, based on that regulation, was made both in the trial court and in the Court of Appeals. In fact, in the Court of Appeals (in the appellant's brief, pages 29, et seq. and pages 15, et seq.) the exact arguments of the defendant in this case (based on that regulation, as well as on the pre-Second War usage of the geographical word used and trade marked years after that war) were made and rejected. The rejection with respect to the geographical "Bavarian" would appear binding with respect to the geographical "Wurzburger."

Unless defendant is enjoined and restrained, it will continue the infringing practices described, which have caused

irreparable damage to a plaintiff without adequate remedy at law.

The defendant has failed to overcome the presumptions of validity with respect to the second and third marks and, in addition, has failed to sustain the burden of proof of its counterclaims seeking declaratory judgments, damages under the antitrust laws, etc.

The plaintiffs are entitled to a judgment upon the first count of the complaint (i. e., trademark infringement and unfair competition) with respect to the names and marks "Wurzburger Hofbrau" and "Wurzburger."

It is unnecessary to decide and this Court does not arrive at any conclusion with respect to the second count based on 15 U.S.C. § 1125(a) (false designations of origin). The counterclaims of the defendant are dismissed and plaintiff is entitled to a judgment thereon and also on the first count of the complaint. A permanent injunction will be entered restraining defendant from using the mark and/or word "Wurzburger" in connection with any beer product. It is found that there is no such thing of recent years as a "Wurzburger" style or type of beer. There are beers produced in Wurzburg. On this record they are not sufficiently different from other "Bavarian" beers to constitute a separate type or style.

This case will require another hearing on the matter of accounting and defendant's profits and plaintiff's damages, in accordance with 15 U.S.C. § 1117. Pending that hearing, the defendant may be enjoined as indicated and the plaintiff may prepare and present such an order, which will be stayed, pending entry of final judgment in this cause, upon the defendant's application therefor and giving bond in such amount as the Court may determine upon such an application being filed. (The bond to cover, of course, only such damages as may be incurred after the date thereof by reason of the stay.)