**KING–SIZE, INC., King-Size Knapp, Inc. of Texas, Plaintiffs,**

v.

**FRANK'S KING SIZE CLOTHES, INC., Frank W. Winker, Frank's King Size Clothes of Austin, Inc., Defendants.**

**Civ. A. No. H–77–1777.**

United States District Court, S. D. Texas, Houston Division.

Aug. 30, 1982.

---

**7.** Having addressed these grounds, the Court does not reach the other defenses asserted by defendants.

Edward T. Robinson, Gaston Snow & Ely Bartlett, Boston, Mass., Julian Clark Martin and Fay E. Morisseau, II, Vinson & Elkins, Houston, Tex., for plaintiffs.

V. Bryan Medlock, Jr. and Herbert J. Hammond, Richards, Harris & Medlock, Dallas, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### Introduction

Plaintiffs, King-Size, Inc. and King-Size Knapp, Inc. of Texas (unless otherwise indicated, hereinafter King-Size), brought this action for trademark and service mark infringement of federally registered marks pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (1963), false designation of origin pursuant to Section 43a of the Lanham Act, 15 U.S.C. § 1125(a) (1982), and unfair competition under principles of Texas common law, against defendants Frank W. Winker, Frank's King Size Clothes, Inc., and Frank's King Size Clothes of Austin, Inc.

Defendants have counterclaimed against plaintiffs for cancellation of plaintiffs' federal trademark and service mark registrations alleging that the registrations were fraudulently procured, and in addition, that the alleged marks are not distinctive of plaintiffs' goods and services. Defendants seek also damages for the assertion of these fraudulently obtained registrations. Finally, defendants counterclaim for cancellation of plaintiffs' state trademark registration.

The cause was tried to the Court sitting without a jury. At the conclusion of the evidence, the Court requested additional briefing by the parties and took the case under advisement. Pursuant to Rule 52(a), Fed.R.Civ.P., the Court hereby enters the following Findings of Fact and Conclusions of Law detailing the reasons for its decision that plaintiffs have failed to sustain their burden of proving that defendants infringed plaintiffs' mark, that defendants had falsely designated the origin of their goods in violation of 15 U.S.C. § 1125(a), or that defendants had engaged in unfair competition under the principles of Texas common law, and that as a consequence thereof, defendants should prevail. The following Findings of Fact and Conclusions of Law reflect also the Court's conclusions that as plaintiffs' trademark and service mark registrations were not fraudulently obtained, and as plaintiffs' mark is not a common descriptive name of an article or substance, defendants' claim for cancellation of plaintiffs' federal registrations must be denied. The Court concludes further, however, that under existing Texas law plaintiffs' state trademark registration must be cancelled.

### Findings of Fact

1. Plaintiff King-Size, Inc., is a Massachusetts corporation with its principal place of business in Brockton, Massachusetts. Admission of Fact.

2. Plaintiff King-Size Knapp, Inc. of Texas is a Texas corporation with a place of business in Houston, Harris County, Texas. Admission of Fact.

3. Defendant Frank W. Winker is a resident of Arlington, Texas. Admission of Fact.

4. Defendant Frank's King Size Clothes, Inc., is a Texas corporation with its principal place of business in Dallas, Texas. Admission of Fact.

5. Defendant Frank's King Size Clothes of Austin, Inc., is a Texas corporation with its principal place of business in Dallas, Texas. Admission of Fact.

6. On November 30, 1946, plaintiff King-Size's predecessor in title was incorporated to do business in the State of Massachusetts. The business for which the company was to be engaged included "[t]he manufacture and sale of wearing apparel, and, the sale and purchase of real estate necessary thereto." Plaintiffs' Exhibit 1. See also Testimony of James Kelley; Plaintiffs' Exhibit 26; Defendants' Exhibit 74.

7. In 1947, King-Size's predecessor in title began using the name king size in the United States in connection with the marketing of men's shoes for large size feet through mail order catalogs. Testimony of James Kelley; Plaintiffs' Exhibit 26; Defendants' Exhibit 74.

8. Due to customer demand, King-Size's predecessor in title entered into the wearing apparel business in 1948 when it began marketing a line of outsize hosiery. Plaintiffs' Exhibit 26; Defendants' Exhibit 74.

9. By 1950, the mail order operations of the company had expanded to the point that the company had set aside $25,000 for advertising. The company's advertising at that time consisted of the placement of advertisements in newspapers and magazines, in addition to a direct mail program. Plaintiffs' Exhibit 26; Defendants' Exhibit 74.

10. On September 20, 1967, the Board of Directors of Knapp Brothers Shoes Manufacturing Corporation (hereinafter Knapp Shoes), unanimously authorized a merger of King-Size's predecessor in title, King-Size, Inc., a wholly-owned subsidiary of Knapp Shoes, into the parent company Knapp Shoes. The directors unanimously authorized also a plan which established upon consummation of the merger heretofore discussed, a division of Knapp Shoes known as "The King-Size Co." Plaintiffs' Exhibit 2.

11. On October 27, 1967, the President of King-Size's predecessor in title, Manuel Alter, authorized the use of the corporate name "King-Size, Inc." by a company named "King-Size, Inc." that had not yet been created. Plaintiffs' Exhibit 3.

12. On October 31, 1967, King-Size, Inc., executed and filed its Articles of Organization with the Secretary of the Commonwealth of Massachusetts. As described in its Article of Organization, King-Size, Inc. was formed for the following purposes:

> To manufacture, buy, sell and deal, at wholesale, at retail, and by mail order, in clothing, headwear, footwear, gloves and wearing apparel and accessories of any and every kind, whether ready or custom made, for men, women and children; and generally to carry on the business of sellers of men's, women's and children's clothing apparel and accessories.

Plaintiffs' Exhibit 4. Such Articles of Organization were approved by the Secretary of the Commonwealth on the same day. Plaintiffs' Exhibit 4.

13. On March 27, 1967, the Articles of Incorporation of Knapp Brothers Shoes-Texas, Inc. were filed with the Secretary of State of the State of Texas. Plaintiffs' Exhibit 7. Following the receipt of the Articles of Incorporation and a finding that such articles conformed to law, the Secretary of State executed a Certificate of Incorporation of Knapp Brothers Shoes-Texas, Inc. Plaintiffs' Exhibit 7. Knapp Brothers Shoes-Texas, Inc. later changed its name to King-Size Knapp, Inc. of Texas. Plaintiffs' Exhibit 8.

14. On October 31, 1967, the Articles of Merger of Knapp Shoes and the former King-Size, Inc. were filed also with the Secretary of the Commonwealth of Massachusetts. Plaintiffs' Exhibit 5. The effective date of the merger, as stated in the Articles of Merger, was the close of business on October 31, 1967. Plaintiffs' Exhibit 5. Such Articles of Merger were approved by the Secretary of the Commonwealth on the same day. Plaintiffs' Exhibit 5.

15. On June 29, 1970, the President of Knapp King-Size Corp. executed an agreement transferring to King-Size, Inc., the assets of its King-Size Division, as well as "all claims and rights under contracts, the right to use the name 'King Size', or any variant thereof, any and all trademarks, trade names . . ., all as the same presently exist. . . ." Plaintiffs' Exhibit 6.

16. On July 1, 1976, King-Size executed an agreement providing its wholly owned subsidiary, Knapp King-Size Corp., with the "right and license to use, and to grant sublicenses thereunder, the trademark and service mark 'King-Size', . . . in connection with offering for sale and the selling of wearing apparel, shoes and clothing for big and tall men." Plaintiffs' Exhibit 9.

17. Subsequently, Knapp King-Size Corp. executed a sublicense agreement with a related company, King-Size Knapp, Inc. of Texas, Plaintiffs' Exhibit 10, whereby King-Size Knapp, Inc. of Texas acquired the "right and license to use the trademark and service mark 'King-Size', . . . in connection with the offering for sale and the sale of wearing apparel, shoes and clothing for big and tall men." Plaintiffs' Exhibit 10.

18. Prior to 1968, King-Size's principal merchandising method was the utilization of mail order catalogs. Approximately 98% of King-Size's business was conducted through mail order catalogs, while the remainder of its sales were made in its outlet store. Testimony of James Kelley.

19. In 1968, King-Size entered the retail market by opening its first retail store in Boston, Massachusetts. At the present time, King Size has 22 retail stores located in major cities throughout the United States, e.g., Chicago, Philadelphia, Houston, Baltimore, Washington D. C., Boston, St. Louis and Pittsburgh. Its retail stores are located mainly in the East and Midwest. It also sells its merchandise in several large department stores. Presently, its retail stores contribute approximately 40% of the total sales made by King-Size. Testimony of James Kelley.

20. The heart of King-Size's mail order business is its customer lists. Names on these lists are obtained through potential customer inquiries as a result of King-Size's national advertising. Testimony of James Kelley. At the present time, approximately 600,000 persons residing in the United States, Canada and Europe are on plaintiffs' customer lists.

21. King-Size's business is dependent upon repeat business. Approximately 80%–90% of King-Size's customers are repeat customers. On the average, King-Size's customers buy merchandise from it 1.8 times a year. Testimony of James Kelley.

22. King-Size has a retail store located in the southwestern section of Houston. Testimony of James Kelley; Plaintiffs' Exhibits 23, 24, 70. Approximately 70% of the Houston store's customers reside within a ten mile radius of the store. Testimony of James Kelley. King-Size does not presently have a retail store in Dallas, Texas. Testimony of James Kelley.

23. Plaintiffs have been using the words "king size" in their names for thirty-five years in connection with their business of selling shoes and wearing apparel to larger than normal size men. Testimony of James Kelley; Plaintiffs' Exhibits 1, 26–28. See Finding 1. The words "king size" are the most prominent feature of plaintiffs' corporate names. Plaintiffs' Exhibits 22–24, 27–32. Their corporate names appear on such items as company stationery, mail order and retail store sales slips, clothing bags, packing boxes, advertising, and mail order catalogs. Plaintiffs' Exhibits 27–32.

24. Since at least 1959, King-Size has vigorously attempted to stop the use by other companies of the term "king size" in connection with the large men's clothing and shoe business. Plaintiffs' Exhibits 34, 35, 38–42, 49; Defendants' Exhibits 4–17, 28, 45–54, 56–74, 113. When it is discovered that a company is using the words "king size" in connection with the sale of large men's clothing or shoes, a copy of the advertisement, if any, is obtained by one of King-Size's employees and forwarded to King-Size's legal counsel. King-Size's counsel

sends then a letter to the alleged infringer notifying the alleged infringer of plaintiffs' claim to the mark "king size", and requesting that the alleged infringer cease and desist the use of "king size" or face legal action. Testimony of James Kelley; Plaintiffs' Exhibits 34, 35, 49. On several occasions, plaintiffs have filed suit against third parties which failed to cease using the term "king size" in connection with the sale of large men's wearing apparel. Testimony of James Kelley; Plaintiffs' Exhibits 38–42; Defendants' Exhibits 28, 113.

25. Frank W. Winker and Frank's King Size Clothes, Inc. (hereinafter Frank) first started using the words "king size" in the large men's clothing business in October, 1971 when Frank opened a retail clothing store in Dallas, Texas. Testimony of Frank Winker; Defendants' Exhibit 17, 77. Shortly thereafter, Frank opened additional retail clothing stores in Austin, Arlington, Lubbock, and Houston, Texas. Testimony of Frank Winker; Plaintiffs' Exhibits 56, 61, 62. A store which Frank had opened in Fort Worth has now since closed. Testimony of Frank Winker.

26. Defendants use presently the term "king size" in their company name; such name appears on its store signs, company stationery, clothing labels and in its advertisements. Testimony of Frank Winker; Plaintiffs' Exhibits 58, 63; Defendants' Exhibits 75, 76. The words "king size" in defendants' names appearing on such items, however, are not as prominent as the name "Frank's". Testimony of Frank Winker; Plaintiffs' Exhibits 25, 58, 63; Defendants' Exhibits 75, 76.

27. Defendants adopted the term "king size" for use in their corporate names and in connection with their business of selling wearing apparel for large size men in the belief that the term was a descriptive term used in the large size men wearing apparel industry and that no one was entitled to the exclusive right to use the term "king size" either as a corporate name or mark. Testimony of Frank Winker. In using the term "king size" in their corporate name and in connection with the sale of wearing apparel

for large size men, it was not defendants' intent to trade off of King-Size's business, good will or reputation. Testimony of Frank Winker.

28. King-Size is the owner of Registration No. 931,531 for the service mark "king size" for use in connection with the mail order and retail store services relative to men's shoes and wearing apparel. This mark was registered on the Principal Register of the United States Patent and Trademark Office on March 28, 1972. Defendants' Exhibit 1. This registration states a "first use" of "in or before 1947". Defendants' Exhibit 1. This registration has not become incontestable. Admission of Fact.

King-Size is the owner also of Registration No. 977,344 for the trademark "king size" for use in connection with men's shoes and wearing apparel. This mark was registered on the principal register of the United States Patent and Trademark Office on January 24, 1974. Defendants' Exhibit 2. This registration states a "first use" of "in or about 1947". Defendants' Exhibit 2. This registration also has not become incontestable. Admission of Fact.

29. In June and in September, 1971, King-Size's president, James Kelley, signed statements contained within King-Size's service mark and trademark registration applications setting forth his belief that King-Size was the "owner of the mark sought to be registered; that to the best of his knowledge and belief no other person, firm, [or] corporation . . . has the right to use said mark in commerce . . . when applied to goods of such other person. . . . " Defendants' Exhibits 1, 2. Kelley testified during the trial of this cause that such belief was based upon the continuous use of "king size" by plaintiffs for twenty-five years. Kelley testified further that his belief that King-Size possessed the exclusive right to use the term "king size" was premised also on a judgment entered in King-Size's favor in the United States District Court for the District of Colorado. Testimony of James Kelley. The suit, styled *Knapp Brothers Shoes Manufacturing Corp. v. Gate's King-Size Clothing, Inc.,*

was commenced by Knapp Shoes, King-Size's predecessor in title, Refer to Findings 10–17, against Gate's King-Size Clothing, Inc. (hereinafter Gates), apparently on the basis of allegations of trademark infringement. Plaintiffs' Exhibits 38, 42; Defendants' Exhibits 1, 2. As a result of its finding that Knapp Shoe's had acquired a secondary meaning in the designation "king size" in a trademark and trade name sense, the district court ordered the following:

1. That the Defendant shall not in any way pass off its merchandise as that of the Plaintiff, nor trade on the Plaintiff's good will in any manner.

2. That the Defendant shall be and hereby is enjoined from any display or publication of its name in a manner which would have any tenancy [sic] to create the impression on the public mind that the Defendant is in any way affiliated with the Plaintiff.

3. That the Defendant shall be and hereby is enjoined from any advertising; including but not limited to such advertising set forth in the telephone book yellow pages, newspapers, magazines, bulletins, flyers or catalogs; using the name Gate's King-Size Clothing without displaying in close proximity thereto and in relatively prominent fashion the statement; 'Not the King-Size Company of Brockton, Massachusetts.'

Plaintiffs' Exhibit 42; Defendants' Exhibits 1, 2. *See also* Testimony of James Kelley.

30. King-Size is the owner of a Texas Certificate of Registration for the mark "king size" for use in connection with the business of selling wearing apparel and shoes for large size men in Texas. Defendants' Exhibit 3.

31. Frank's King Size Clothes, Inc. and Frank's King Size Clothes of Austin, Inc. were incorporated using the words "king size" in their corporate names and in connection with their business of selling wearing apparel for large size men prior to the issuance of King-Size's federal and state registrations. Admission of Fact.

32. Since 1947, King-Size has had considerable success with its sale of shoes and wearing apparel to large size men. Its sales have grown steadily from approximately $15,300 in 1947 to approximately $23,243,500 in 1977. During this time, King-Size has increased its advertising budget from approximately $5,300 in 1947 to approximately $875,500 in 1977. Testimony of James Kelley; Plaintiffs' Exhibit 14. In 1981, King-Size's advertising expenses were expected to total approximately $970,000, with catalog expenses and postage expenses totalling $2,400,000. Testimony of James Kelley.

33. King-Size and its predecessor in title have advertised nationally since 1947. King-Size's promotional activities have consisted of the placement of advertisements in magazines with nationwide circulations, *e.g.,* Better Homes and Gardens, Popular Mechanics, Esquire, Redbook, Family Circle, Testimony of James Kelley; Plaintiffs' Exhibits 19, 21, 22, 28, 32, 66, 67, major city newspapers, *e.g.,* Chicago Tribune, Dallas News, Houston Post, Houston Chronicle, Los Angeles Times, Pittsburgh Press, Testimony of James Kelley; Plaintiffs' Exhibits 20, 23, 24, 28, 66, 67, and the yellow pages of phone books of large metropolitan cities. Testimony of James Kelley; Plaintiffs' Exhibit 44. In samples of these ads entered into evidence, "king size" is displayed in a prominent fashion. Plaintiffs' Exhibits 22–24, 28, 32, 44. Plaintiffs have advertised also on television and radio. Plaintiffs' Exhibits 66, 67.

In addition to the above, King-Size utilizes a nationwide mail order program to promote its products. Testimony of James Kelley; Plaintiffs' Exhibits 14, 16, 18, 29–31, 66; Defendants' Exhibits 25, 27, 96, 97. King-Size mails catalogs to its customers and potential customers 10 times a year. Testimony of James Kelley. Since 1967, plaintiffs have mailed from 3,802,083 to 8,718,337 catalogs a year in which the mark "king size" appear prominently in plaintiffs' names. Plaintiffs' Exhibits 18, 29–31; Defendants' Exhibits 25, 27, 96, 97.

34. Defendants' advertising consists of the placement of advertisements in newspapers, *e.g.,* Houston Post, Houston Chronicle,

Dallas News, and the yellow pages of telephone books in the cities where it has stores. Testimony of Frank Winker; Plaintiffs' Exhibits 25, 58, 63; Defendants' Exhibits 55, 75. The words "king size" are included in defendants' names appearing in these advertisements. Plaintiffs' Exhibits 25, 63; Defendants' Exhibit 75. Defendants have advertised also on television and radio in Lubbock, Texas. Testimony of Frank Winker.

35. King-Size's customers can be classified demographically into four groups: (1) those men under six feet tall; men falling within this group usually weigh over 250 pounds and have large waists; (2) men who are at least six feet four inches tall; men falling within this group usually weigh at least 150 and have waists smaller than their chests; and (3) men ranging in height from six feet to six feet three inches tall; men falling within this category generally have an unusual anatomical feature, such as long legs, a large trunk, or large feet. Approximately, 50% of those men in this group are potential customers of plaintiffs. Testimony of James Kelley; Plaintiffs' Exhibit 33. Approximately 2% to 3% of the male population are potential customers. Testimony of James Kelley; Plaintiffs' Exhibit 33. *See also* Plaintiffs' Exhibit 16. Finally, since a substantial number of men do not like to shop for clothing, the fourth category of King-Size's customers are women; typically, these women are wives of men who use the products that King-Size sells. More than one-half of plaintiff's customers fall into this category. Testimony of James Kelley.

36. Although retailers of large size men's clothes, including plaintiffs and defendants, frequently use the terms "Tall and Big" or "Big and Tall" to describe their businesses or products, Testimony of James Kelley; Testimony of Frank Winker; Plaintiffs' Exhibits 44, 46A, 47, 48, 58, 60, 63–65; Defendants' Exhibits 20, 21, 23, 24, 29, 34, 35, 37, 45, 55, 59, 67, 71, 75, 76, 96, 97, a number of retailers of large size men's clothes, besides plaintiffs and defendants have utilized in the past or are presently utilizing the term "king size" to describe

men's clothing in larger than normal sizes. See Plaintiffs' Exhibit 44. Examples of such retailers are as follows: Poley's King Size Clothes, Plaintiffs' Exhibits 34, 35; Defendants' Exhibits 4–21, 23, 24, 26, 27, 35–41, 44, 50; Hirsch's, Plaintiffs' Exhibit 34; Defendants' Exhibit 47; Craig's King Size Clothes, Defendants' Exhibit 69; Baucom's Shoe Store, Plaintiffs' Exhibit 34; Defendants' Exhibit 51; David's King Size Clothes, Testimony of Frank Winker; Harry's King Size Clothes, Plaintiffs' Exhibits 34, 41; Defendants' Exhibits 33, 34, 71; King Size Clothes, Inc. (Hyroop's), Plaintiffs' Exhibit 34; Defendants' Exhibits 29, 45; Olson's [King Size Shop] Clothing Store, Inc., Plaintiffs' Exhibit 34; Defendants' Exhibit 59; Roy F. Gill, Plaintiffs' Exhibit 34; Defendants' Exhibit 68; Ramparts, Plaintiffs' Exhibit 34; Defendants' Exhibits 49, 56; Harrison Shoes, Plaintiffs' Exhibit 34; Defendants' Exhibit 54; Gates King Size Clothes, Plaintiffs' Exhibits 34, 38, 42, 49; Defendants' Exhibit 53; Chandler's, Plaintiffs' Exhibit 34; Defendants' Exhibit 57; Boyd's Men's Store, Plaintiffs' Exhibit 34; Defendants' Exhibit 60; Hewes & Potter, Defendants' Exhibit 99; J. Packard Shirt Company, Plaintiffs' Exhibit 34; Defendants' Exhibits 39, 64; Duffy T's King Size Apparel, Inc., Plaintiffs' Exhibits 34, 54; Defendants' Exhibit 65; Albany Street Factory Store, Plaintiffs' Exhibit 34; Defendants' Exhibit 48; King-Size Shoes, Plaintiffs' Exhibit 34; Defendants' Exhibit 52; Berman's King Size Clothes, Plaintiffs' Exhibit 34; Defendants' Exhibit 46; Budget King Size, Plaintiffs' Exhibit 34; Defendants' Exhibit 58; Gentlemen's Wear House, Plaintiffs' Exhibit 34; Defendants' Exhibit 63; London Majesty, Plaintiffs' Exhibit 34; Defendants' Exhibit 66; Korvettes, Defendants' Exhibit 62; The Style Store for Big & Tall, Plaintiffs' Exhibit 34; Defendants' Exhibit 67; The Justin Companies, Plaintiffs' Exhibit 34; Defendants' Exhibit 70; and Mr. Tall & Big of Las Vegas, Defendants' Exhibit 104. Even the J. C. Penney Company considered employing at one time the term "king size" to refer to its clothing for large size men. Testimony of James

Kelley; Plaintiffs' Exhibit 34; Defendants' Exhibit 72. Manufacturers in the clothing industry employ also the words "king size" to describe men's wearing apparel for larger than normal sizes. Testimony of Frank Winker; Plaintiffs' Exhibit 29 at 89; Defendants' Exhibits 21, 24, 26, 27, 30, 34, 41–43, 64, 93–95, 109S, 109V, 117.

37. Plaintiffs have used descriptively the term "king size" in their advertisements, Plaintiffs' Exhibit 28; Defendants' Exhibit 108, and in their mail order catalogs, *see, e.g.,* "Arrow Goes King Size", Plaintiffs' Exhibit 29 at 26; "McGregor Jackets Go King Size", Plaintiffs' Exhibit 29 at 42; "Jantzen Goes King Size", Plaintiffs' Exhibit 29 at 74; "King Size Hats and Gloves", Plaintiffs' Exhibit 29 at 78; "London Fog Goes King Size", Plaintiffs' Exhibit 29 at 79; "Adler Socks Goes King Size", Plaintiffs' Exhibit 29 at 85; "Arrow King Size Handkerchiefs", Plaintiffs' Exhibit 29 at 89; "Clarke's Goes King Size", Plaintiffs' Exhibit 29 at 104. *See also* Defendants' Exhibits 22, 25, 27, 79, 99.

38. The term "king size" is widely used in describing the size of various consumer products aside from shoes and wearing apparel: automatic dishwashing detergent, Defendants' Exhibits 109O, 109P; back massager, Defendants' Exhibit 32; beds or mattresses, Defendants' Exhibits 98 B–D, 98F, 98 K–M, 98 P–U, 98W, 98Y, 98 CC–GG; bed sheets, Defendants' Exhibits 98E, 98BB, 98 II–JJ, 98LL; bed spreads, Defendants' Exhibit 98HH; chairs, Defendants' Exhibit 98U; cigarettes, Defendants' Exhibits 98A, 98H, 98V, 103, 109J; a cigarette case, Defendants' Exhibit 109U; comforters, Defendants' Exhibit 98N; corn chips, Defendants' Exhibit 109I; dishwashing liquid, Defendants' Exhibits 109L, 109M; drinking tankards, Defendants' Exhibit 116; frozen dinners, Defendants' Exhibit 107; household disinfectant, Defendants' Exhibit 109Q; laundry detergent, Defendants' Exhibits 109 A–H, 109K, 109N, 109R, 109W, 109X; mattress pads, Defendants' Exhibits 98AA, 98KK; pillows, Defendants' Exhibits 98X, 98Z; plan book for use in the construction of a model railroad track, Defendants' Exhibit 105; playing cards, Defendants' Exhibit 106; styling and wraps, Defendants' Exhibit 109T; towels, Defendants' Exhibit 98E, and waterbeds, Defendants' Exhibits 98O, 98R.

39. The term "king size" is defined in Webster's Third New International Dictionary (1966) as "longer than the regular or standard size, . . . much larger in size than is usual for a particular class of things: OVERSIZE. . . ." Defendants' Exhibit 86. The 1975 edition of the Oxford Illustrated Dictionary similarly defines the term "king size" as larger than standard size. Defendants' Exhibit 79. Excerpts from ten additional dictionaries provided similar definitions. Defendants' Exhibits 78, 80–91, 102. *See also* Defendants' Exhibit 116.

40. Plaintiffs first learned of defendants' existence in May, 1977 through one of defendants' advertisements. Prior to this time, plaintiffs were unaware of defendants' existence. Admission of Fact; Testimony of James Kelley.

41. During the trial of the instant cause, King-Size called as witnesses several of its customers residing in the Houston area. Each of these individuals testified that they associated the words "king size" with plaintiffs. Testimony of Dora Humke; Testimony of George Anderson; Testimony of Cletus Witke; Testimony of Rosemary Ann Parker; Testimony of J. Mitchell; Testimony of Jerry McGowen.

Several of these persons testified also that on at least one occasion in the past, they had seen a clothing store with the words "king size" in its name and had mistakenly believed this store to be associated with plaintiffs. These persons identified positively this store as being located on the corner of Westheimer and Voss. Testimony of Dora Humpke; Testimony of Cletus Witke; Testimony of Rosemary Ann Parker; Testimony of Jerry McGowen. This store was not one of defendants' stores. Testimony of Frank Winker.

42. Of those customers who testified, there was no consensus regarding whether the use of "king size" by both plaintiffs and defendants was confusing. One witness

was unsure whether she ever confused defendants' Houston store with plaintiffs, Testimony of Dora Humpke; another witness testified that at one time he thought that defendants' Houston store was affiliated with plaintiffs, Testimony of George Anderson, while yet another witness shopped at defendants' Houston store but never confused this store with plaintiffs' store. Testimony of Cletus Witke.

43. Defendants introduced a survey on the issue of secondary meaning. Jack Taylor, an expert in the field of marketing research, designed and supervised a telephonic survey in which a total of 400 men who were at least 6′ 2″ in height from the cities of Dallas and Houston were interviewed during the period of March 9–12, 1981. Testimony of Jack Taylor; Defendants' Exhibit 112A. The objectives of the survey were "to determine what is brought to mind when the term king size is mentioned; [t]o determine what is brought to mind when the term is associated with men's apparel; [t]o measure awareness of both stores." Defendants' Exhibit 112A.

44. The names of those men who were interviewed were obtained from records of Texas drivers' licenses issued or renewed in the past two years to men who were 6′ 2″ or more in height. The sample of men in Dallas came from that area of the city with the number 752 as the first three digits in the zip code. See Plaintiffs' Exhibit 71. In Houston, the sample was drawn from areas with the zip codes 77001–77031; such areas are located in the central and eastern sections of Houston. See Plaintiffs' Exhibit 70. There were 1,820 names drawn from each market. From this sample 200 names from each city were then randomly selected.[1] Testimony of Jack Taylor; Defendants' Exhibit 112A.

45. Those persons who participated in the survey as interviewers did not know for whom the survey was being conducted. The interviewers introduced themselves as representatives of M/A/R/C Consumer Research, the company with which defendants' expert is associated. Testimony of Jack Taylor; Defendants' Exhibits 112A, 114. The persons being interviewed were not informed, however, of the identity of the sponsor of the survey. Defendants' Exhibit 112A.

The interviewers worked in a single room with a supervisor and monitor present at all times. The monitor listened to conversations on a random basis in order to ensure that all questions were asked properly and that a good rapport was being maintained with those persons being interviewed. The supervisor was available to deal with sample control, any questions that might arise and the administration of the survey. Testimony of Jack Taylor; Defendants' Exhibit 112A.

46. The survey consisted of a series of questions drafted by Mr. Taylor in conformity with the objectives outlined above. Testimony of Jack Taylor; Defendants' Exhibit 112A. Those men interviewed were asked what came to mind when "king size" was mentioned; what other things did they think of; what they thought of when "king size" was mentioned in connection with men's wearing apparel or clothing; and what was the name of the store that came to mind. Testimony of Jack Taylor; Defendants' Exhibit 112A.

In response to the first two questions, a substantial number of men identified products other than clothes or stores or mail order companies selling men's clothes. As to the third question, a substantial majority answered either clothes for larger than normal size men, Dallas—33%, Houston—29%, stores selling men's wearing apparel or clothes, Dallas—12%, Houston—13%, or mentioned specific items of wearing apparel. A very small percentage of interviewees responded to the question with names of specific stores or companies. Defendants' Exhibit 112A. The report, Defendants' Ex-

---

1. A breakdown by percentage of the heights of those men who participated in the survey is as follows·

| | | | |
|---|---|---|---|
| 6′2″ | 56% | 6′4″ | 13% |
| 6′3″ | 25 | 6′5″ | 3 |
| | | 6′6″ | 2 |
| | | 6′7″ | 1 |

hibit 112A, reveals that 2% answered King-Size Company, 1% King Size Company Men's Shop, 1% King Size Mail Order, and 1% King size store/clothes. Testimony of Jack Taylor; Defendants' Exhibit 112A. In response to the fourth question, only a small percentage of men interviewed identified either plaintiffs or defendants; plaintiffs: Dallas—2%, Houston—5%;[2] defendants: Dallas—2%; Houston—2%. The other stores that were identified specifically by name included Tally Ho, Dallas—5%; Zindlers', Houston—2%; Hyroop's, Dallas—1% and Harold's, Houston—1%. Defendants' Exhibit 112A.

The members of the sample interviewed were asked also if they had ever heard of a men's clothing store specializing in large sizes and called "King Size Company Men's Shop" or "Frank's King Size Clothes". The report of the survey indicates that 15% of those interviewed in Dallas and 21% of those interviewed in Houston had heard of King Size Company Men's Shop, and 13% of those interviewed in Houston and Dallas had heard of Frank's King Size Clothes. Defendants' Exhibit 112A.

The fifth question in the survey sought the number of men being interviewed who had ever purchased clothing from mail order companies or stores specializing in larger sizes. Defendants' Exhibit 112A. Defendants' Exhibit 112A indicates that of those men interviewed, 67% of the men in Dallas and 66% in Houston had never purchased men's clothing from mail order companies or stores specializing in larger sizes.

47. Defendant Winker testified during the trial that he was not aware of any instances of actual confusion between defendants and plaintiffs since defendants opened the first retail store in 1972.

48. After plaintiffs filed this suit in 1977, defendant Winker instructed the manager of defendants' retail stores to inform him of any instances of actual confusion between plaintiffs and defendants. Testimony of Frank Winker. Since that time, defendant Winker has not been informed of one instance of actual confusion. Testimony of Frank Winker.

49. In a record replete with inconsistencies permitting contrary inferences, the Court has carefully reviewed all of the evidence and concludes that the more credible evidence supports the above Findings of Fact.

*Conclusions of Law*

1. This Court has jurisdiction over the parties and the subject matter of this cause pursuant to 28 U.S.C. § 1338 (1976), and 15 U.S.C. § 1121 (1982).

I. *Trademark Infringement*

A. *Strength of the Mark*

2. Plaintiffs claim first the benefit of 15 U.S.C. § 1057(b) (1963),[3] which

| | Dallas | Houston |
|---|---|---|
| Harold's | –% | 3% |
| Non-specialty stores | 10 | 10 |
| Others | 10 | 13 |
| Don't know | 8 | 5 |

Defendants' Exhibit 112A.

---

**2.** Of those men who were interviewed, approximately 33% in Dallas and 34% in Houston had purchased men's clothing from mail order companies or stores specializing in clothes for large size men. The companies or stores from which these purchases were made are as follows:

| | Dallas | Houston |
|---|---|---|
| King Size Company, King Size, Inc. | 2% | 7% |
| King Size Company Men's Shop | – | 2 |
| King Size Store/King Size Clothes | – | 2 |
| King Size Catalogue | 1 | – |
| King Size Company of Mass. | 1 | – |
| Tally Ho | 4 | 1 |
| Tall Man's Shop/Store | 2 | 2 |
| Frank's King Size Clothes | 2 | 1 |
| Zindler's | – | 5 |
| Brooks Brothers | – | 2 |
| Hyroop's | 2 | 2 |

**3.** The trademark laws are designed to protect various interests. Three basic interests as recognized by one court are:

first, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks—a factor which may weigh in the senior user's favor where the

provides that registration on the Principal Register "shall be prima facie evidence of registrant's ownership of the mark and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate subject to any conditions or limitations stated therein."[4] *See Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 378 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Waples-Platter Companies v. General Foods Corp.,* 439 F.Supp. 551, 574 (N.D.Tex.1977). *See also* 15 U.S.C.

> defendant has not developed the mark himself.
> *Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1172 (2d Cir. 1976). An additional interest is the senior user's "interest in preventing others from getting a free ride on the reputation and good will he has established...." *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Balance against the aforestated interests, however, "is a countervailing public interest in not providing an overly broad ambit of protection that would enable the senior user to preclude others from entering unrelated markets into which it has no intention of entering." *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 159 (S.D.N.Y.1980).

4. Plaintiffs do not assert that the term is incontestable. Refer to Finding 28. A mark on the Principal Register becomes incontestable only after the requirements of 15 U.S.C. § 1065 (Supp.1982) have been satisfied. Section 1065 provides:

> Except on a ground for which application to cancel may be filed at any time under subsections (c) and (e) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: *Provided,* That—
> (1) there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

§ 1115(a) (1982). Although a statutory presumption of validity is accorded "king size" by reason of plaintiffs' registrations, 15 U.S.C. §§ 1057(b), 1115(a), Refer to Finding 28, "this presumption is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark." *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 119 (5th Cir. 1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). *See also Homemakers Home and Health Care Services, Inc. v. Chicago Home for the Friendless,* 484 F.2d 625, 628 (7th Cir. 1973);

> (2) there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of; and
> (3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and the other matters specified in subsections (1) and (2) of this section; and
> (4) no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise.
> Subject to the conditions above specified in this section, the incontestable right with reference to a mark registered under this chapter shall apply to a mark registered under the Act of March 3, 1881, or the Act of February 20, 1905, upon the filing of the required affidavit with the Commissioner within one year after the expiration of any period of five consecutive years after the date of publication of a mark under the provisions of subsection (c) of section 1062 of this title.
> The Commissioner shall notify any registrant who files the above-prescribed affidavit of the filing thereof.

Once such registration becomes incontestable, the registration becomes conclusive, rather than prima facie evidence of the right to use the mark subject only to the seven defenses enumerated in 15 U.S.C. § 1115(b) (1982). "An 'incontestable' mark cannot be challenged as lacking secondary meaning; such marks are presumed conclusively to be nondescriptive or to have acquired secondary meaning." *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184–85 (5th Cir. 1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 377 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

*Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774, 779 (2d Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965).

The threshold question then is whether the mark "king size" is protectable or registerable. *Vision Center v. Opticks, Inc., supra; American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 10 (5th Cir. 1974); *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 485 (5th Cir. 1971). Four categories of terms, in ascending order of strength, have been defined to assist the courts in their determination in this regard. These categories are as follows: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1164 (11th Cir. 1982); *Vision Center v. Opticks, Inc., supra,* at 115; *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976). "Strong marks are given 'strong' protection—protection over a wide range of related products and variations on appearance of the mark", while "[w]eak marks are given a narrow range of products both as to products and as to visual variations." 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 11:24, at 398–99 (footnote omitted).

"A generic term [5] is the name of a particular genus or class of which an individual article or service is but a member." [6] *Vision Center v. Opticks, Inc., supra,* at 115; *see also Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 (5th Cir. 1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Anti-Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 301–04 (9th Cir. 1979); *Miller Brewing Co. v. G. Heileman Brewing Co., supra,* at 79. A generic term is incapable of achieving trade name protection. *Soweco, Inc. v. Shell Oil Co., supra,* at 1183; *Vision Center v. Opticks, Inc., supra,* at 115; *Miller Brewing Co. v. G. Heileman Brewing Co., supra,* at 79. Moreover, if a registered mark at any time became generic with respect to a particular article, the mark's registration can be cancelled. 15 U.S.C. § 1064(c).[7] *See, e.g., Anti-Monopoly,*

5. As used in the Lanham Act, the term "generic" is synonomous with the phrase "common descriptive name". *See* 15 U.S.C. §§ 1064(c), 1065(4) (1963 & Supp. 1982).

6. The following terms have been held to be generic:

AL–KOL (Alcohol) (Rubbing alcohol)
ASPIRIN (acetyl salicylic acid)
BAG RACK (golf bag support)
BATH OIL BEADS (bath water softener, oil and perfume)
BRASSIERE (women's bust supporter)
CELLOPHANE (transparent cellulose sheets and films)
COLA (type of soft drink)
CUBE STEAK (tenderized steaks)
DRY ICE (solid carbon dioxide)
ENDERS (type of razors and blades)
ESCALATOR (moving stairway)
FLINCH (card game)
FLOR–TILE (wooden flooring)
HAIR COLOR BATH (hair coloring preparation)
HILL–BILLY (class of soft drinks)
JUJUBES (gum candy)
JYMBAR ("Gym bar") (Chinning exercise bar)
MATCHBOX (toy cars in matchbox-sized boxes)
MONTESSORI (educational method and toys used for such method)
PASTEURIZED (face cream)
POCKET BOOK (paperback books)
PREFORMED (Preformed electrical equipment)
ROOTS (type of vacuum pumps)
RUBBER ROPE (elasticized rubber rope)
SAFE T PLUG (electrical plugs)
SERVO (Servomechanisms)
SHREDDED WHEAT (baked wheat biscuits)
THE PILL (birth control oral contraceptive)
THERMOS (vacuum-insulated bottles)
TRAMPOLINE (rebound tumbling equipment)
WORK WEAR (industrial clothing)
YO–YO (return top).

1 J. Thomas McCarthy, *supra,* p. 24, § 12.3, at 410–12 (footnotes omitted).

7. Section 1064(c) of Title 15 provides:

A verified petition to cancel a registration of a mark stating the grounds relied upon, may, upon payment of the prescribed fee, be filed by any person who believes that he is or will be damaged by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905—

...(c) at any time if the registered mark becomes the common descriptive name of an

**1152**

Inc. v. General Mills Fun Group, supra, at 301; Haughton Elevator Co. v. Seeberger, 85 U.S.P.Q. 80 (Comm'r Pat. 1950).

A descriptive term,[8] on the other hand, specifically describes a characteristic or quality of a product or service. Soweco, Inc. v. Shell Oil Co., supra, at 1183; Vision Center v. Opticks, Inc., supra, at 115; Miller Brewing Co. v. G. Heileman Brewing Co., supra, at 79. "[A] mark is descriptive if it is descriptive of: the intended purpose, function or use of the goods; of the size of the goods; of the class of users of the goods, of a desirable characteristic of the goods, or of the end effect upon the user." [9] 1 J. Thomas McCarthy, supra, § 11:5, at 353.

█ A descriptive term is not automatically protectable unless it has acquired a secondary meaning. 15 U.S.C. § 1052(e)(1) (1976).[10] See also Safeway Stores, Inc. v.

Safeway Discount Drugs, supra, at 1165 n.9; Soweco, Inc. v. Shell Oil Co., supra, at 1183; Vision Center v. Opticks, Inc., supra, at 115; Miller Brewing Co. v. G. Heileman Brewing Co., supra, at 79; Abercrombie & Fitch Co. v. Hunting World, Inc., supra, at 10. As the United States Supreme Court stated in Estate of P. D. Beckwith v. Commissioner of Patents, 252 U.S. 538, 543–44, 40 S.Ct. 414, 416, 64 L.Ed. 705 (1920):

It was settled long prior to the Trademark Registration Act that the law would not secure to any person the exclusive use of a trademark consisting merely of words descriptive of the qualities, ingredients, or characteristics of an article of trade. This for the reason that the function of a trademark is to point distinctively, either by its own meaning or by association, to the origin or ownership of the wares to which it is applied, and words merely descriptive of qualities, in-

---

article or substance, or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsections (a), (b), or (c) of section 1052 of this title for a registration hereunder, or contrary to similar prohibitory provisions of said prior Acts for a registration thereunder, or if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services in connection with which the mark is used.

**8.** The following marks have been found to be descriptive:

HOLIDAY INN motel
IMPERIAL whiskey
INTERNATIONAL maps and globes
IVY LEAGUE clothing
JOY perfume
JOY detergent
KUF'N KOLAR for cuff and collar cleaner
LITTLE BASKET for trash receptacles
LITTLE TAVERN restaurant-bar
MICRO wheel balancing weights
MUSTANG trailers
NAVY CUT tobacco
NEVA–WET water repellant treatment
100% LIQUID CENTERS for chocolate candies with liquid centers
POCKET BOOK for paperback books
RAISIN–BRAN cereal made with raisins and brans
ALO for cream of aloe plant
BEER NUTS for salted nuts
BUFFERIN for buffered aspirin
CHAP STICK skin preparation in a stick

COCO–QUININE for chocolate-flavored quinine
CONSUMER TESTING LABORATORIES for consumer testing services
CULTURE RIPENED coffee
DYANSHINE shoe polish
EBONITE hard rubber bowling balls
ESCAPE FROM THE ORDINARY for extraordinary clothing
FASHIONKNIT sweaters
FINELINE mechanical pencils
5 MINUTE glue which sets in five minutes
FOOD FAIR supermarket
FUND OF FUNDS mutual fund
RITE–FIT furniture slip covers
SAVMOTOR oil additive
SAVON gasoline
SHOPPERS FAIR grocery store
STEAK & BREW restaurant
SUDSY ammonia
SUPER BLEND superior blend of motor oil
THE 88 STORE store selling items at 88¢
TINTZ hair coloring formula
TRIM for fingernail clippers
WORLD BOOK encyclopedia.
J. Thomas McCarthy, supra, § 11:8 at 359–61 (footnotes omitted).

**9.** The term descriptive as used in this opinion refers to marks that are "merely descriptive" within the meaning of section 1052(e)(1) of Title 15. It does not refer to "generic" or "common descriptive" terms. See Note 5.

**10.** Section 1052(e)(1) prohibits the registration of a mark that, when applied to the goods of the applicant is merely descriptive . . . of them.

gredients, or characteristics, when used alone, do not do this. Other like goods, equal to them in all respects, may be manufactured or dealt in by others, who, with equal truth, may use, and must be left free to use, the same language of description in placing their goods before the public.

See also *Armour & Co. v. Organon, Inc.,* 245 F.2d 495, 498, 500, 44 Cust. & Pat.App. 1010 (1957). One commentator has discussed also the rationale behind the requirement that descriptive terms have secondary meaning in order to be protectable:

(1) Descriptive adjectives can be truthfully applied to a whole range of goods and services. Thus, a descriptive term cannot, per se, function to identify and distinguish the goods or services of only one seller in the marketplace. A descriptive term merely informs the buyer of an alleged quality of the product. Many other products may have similar qualities, and use of the term will not help the consumer to distinguish products of different sellers. For example, the use of BEST on writing paper or TASTY on bread merely describes something about the product. To the consumer, these terms are merely laudatory or informative *advertising. Also,* terms which describe a quality or appearance of a product, such as SUDSY ammonia, do not per se identify and distinguish a given seller's product.

(2) Descriptive terms are regarded as words in the public domain in the sense that all sellers should be free to truthfully use these terms to describe their merchandise. For example, the Court of Customs and Patent Appeals stated that descriptive terms cannot be accorded protection without secondary meaning since, 'for policy reasons, *descriptive words* must be left free for public use.' Other courts state this concept in terms of 'the danger of depleting the general vocabulary available to all for description,' and that 'one competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods.' That is, one seller cannot, by mere adoption and use, obtain an exclusive right to prevent others from using descriptive terms. No one seller should be allowed the exclusive right to describe a product by its primary characteristic, and thus pre-empt or limit competitors' use of the term to describe their own products.

1 J. Thomas McCarthy, *supra,* § 11:5, at 354–55 (footnotes omitted).

■ The next category of marks is composed of suggestive terms. A suggestive term intimates, rather than describes a characteristic or quality of a product or service and requires imagination by the observer in order to be understood.[11] *Soweco,*

11. Illustrative of suggestive marks are the following:

ARTYPE cut-out letters for artists
AUDIO FIDELITY phonograph records
BAC–A–BELT belt backing materials
CHARRED KEG whiskey
CHEW'N CLEAN dentifrice
CHICKEN OF THE SEA tuna fish
COMPUGRAPHIC typesetting equipment
COPPERTONE sun tan oil
CURV permanent wave solution
CYCLONE wire fence
FRESHIE soft drinks
FROM MAINE'S COOL BREEZE TO THE FLORIDA KEYS moving service
FRUIT SUNDAE yogurt
HANDI WIPES dusting cloths
HULA HOOP plastic hoops
HYGIENT hygienic mattress covers
LEKTRONIC electric shavers
LIF JIB mobile cranes
LOC–TOP bottle closure caps
MARRIAGE PROPONENTS for prospective marriage partner service
MATERNALLY YOURS maternity clothing store
MINITMIX biscuit mix
ORANGE CRUSH orange drinks
POLY PITCHER polyethylene plastic pitcher
POLYCOPY photocopying machines
POTPOURRI as title of publication
Q–TIPS wooden sticks with cotton on end
RAPID–SHAVE shaving cream
RESONITE clarinets
RIOTER protective helmets for peace officers
SEASON–ALL aluminum storm windows
7–ELEVEN food store chain
SEVENTEEN teen-age magazine
SKINVISIBLE transparent medical adhesive tape
SLICED ANIMALS on jigsaw puzzle pictures
STRONGHOLD nails

*Inc. v. Shell Oil Co., supra,* at 1184; *Vision Center v. Opticks, Inc., supra,* at 115; *Miller Brewing Co. v. G. Heileman Brewing Co., supra,* at 79. A suggestive term does not require proof of secondary meaning in order to receive trademark protection. *Soweco, Inc. v. Shell Oil Co., supra,* at 1184; *Vision Center v. Opticks, Inc., supra,* at 115.

The most common types of marks are arbitrary or fanciful marks. Such marks bear no relationship to the product or service. *Soweco, Inc. v. Shell Oil Co., supra,* at 1184. " 'Fanciful' marks [12] consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark. Such marks comprise words which are either totally unknown in the language or are completely out of common usage at the time . . . ." 1 J. Thomas McCarthy, *supra,* § 11:3, at 347.

Unlike fanciful marks, arbitrary marks [13] are composed of words "which are in common linguistic use but which, when used with the goods or services, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *Id.* at 350.

While the four categories of terms are easily defined, the lines of demarcation between the various categories are not always clear. This difficulty is compounded further "because a term that is in one category for a particular product may be in quite a different category for another, because a term may shift from one category to another in light of differences in usage through time, because a term may have one meaning to one group of users and a different one to others, and because the same term may be put to different uses with respect to a single product." *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at 9. It has recognized further that

> [t]he distinctiveness of a mark cannot be determined in the abstract, but only by reference to the goods or services upon which the mark is used. For example, the mark BRILLANT may be 'descriptive' on diamonds, 'suggestive' on furniture polish, and 'arbitrary' on canned applesauce. The exact position of the line between descriptive and suggestive marks is almost impossible to define in the abstract.

1 J. Thomas McCarthy, *supra,* § 11:20, at 389. This difficulty has been judicially recognized: "It is quite impossible to get any rule out of the cases beyond this: That the validity of the mark ends where suggestion ends and description begins." *Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc.,* 297 F. 247, 248 (S.D.N.Y.1923), *aff'd,* 4 F.2d 1018 (2d Cir. 1925). *See also Soweco, Inc. v. Shell Oil Co., supra,* at 1183.

3. In the instant cause, the Court is confronted with the task of determining whether the mark "king size" is descriptive or suggestive. A thorough review of the case law has uncovered various tests which have been used in making such a determination. Some courts have considered whether the mark described the ingredients, qualities, or characteristics of the goods. *See Andrew J. McPartland, Inc. v.*

SWEETARTS candy
SWEET SIXTEEN women's dress shop
TELECHRON electric clocks
TIE RAK ties and accessories
UNBURN skin preparation
WEAREVER aluminum cooking utensils
WRANGLER western boots and jeans
ZIP saws.
J. Thomas McCarthy, *supra,* § 11:23 at 396–98 (footnotes omitted).

12. Examples of fanciful marks are as follows:
ARGYROL antiseptic
CLOROX bleach
CUTEX cuticle-removing liquid
CUTICURA toilet soap
KODAK photographic supplies

KOTEX sanitary pads
NUDOL laxative
ODOL mouthwash
POLAROID optical devices, camera, etc.
1 J. Thomas McCarthy, *supra,* § 11:3 at 349 (footnotes omitted).

13. Marks which have been found to be arbitrary marks include:
ARROW liquerers
BLACK & WHITE scotch whiskey
CONGRESS spring water
COMMAND hair care products
STORK CLUB night club.
1 J. Thomas McCarthy, *supra,* § 11:4 at 351–53 (footnotes omitted).

*Montgomery Ward & Co.,* 164 F.2d 603, 604–05, 35 Cust. & Pat.App. 802 (1947), *cert. denied,* 333 U.S. 875, 68 S.Ct. 904, 92 L.Ed. 1151 (1948). Subject also to consideration by other courts was whether the mark conveyed information regarding a function, purpose, or use of the goods. *In re Reynolds Metals Co.,* 480 F.2d 902, 903 (Cust. & Pat.App.1973); *In re Realistic Co.,* 440 F.2d 1393, 1394 (Cust. & Pat.App.1971); *Modern Optics, Inc. v. Univis Lens Co.,* 234 F.2d 504, 505 (2d Cir. 1956). Further considerations include whether the mark describes a feature or part of the goods, *Sylvania Elec. Prods. Inc. v. Dura Elec. Lamp Co.,* 247 F.2d 730, 732–33 (3rd Cir. 1957), and whether it conveys any information about any properties of the goods. *See* J. Gibson, *Trademark Protection and Practice* § 23, at 2–31 (1977); 1 J. Thomas McCarthy, *supra,* § 11:21.

Perhaps the best statement of the distinction between the two terms, however, is found in *Union Carbide Corp. v. Ever-Ready Inc., supra,* at 379: "Generally speaking, if the mark imports information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *See also* A. Seidel, S. Dalroff & E. Gonda, *Trademark Law and Practice* § 406, at 77 (1963); *Vision Center v. Opticks, Inc., supra,* at 116; *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at 11. ("A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.") It has been recognized that "[t]he dictionary definition of the [mark] is an appropriate and relevant indication 'of the ordinary significance and meaning of words' to the public." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra,* at 11 n.5; *Claremont Polychemical Corp. v. Atlantic Powdered Metals, Inc.,* 470 F.2d 636, 637 (Cust. & Pat.App.1972). "And of course, the only relevant reference point is meaning in the eyes of the purchasing public." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra,* at 11 n.5.

During the trial of this cause, the defendants introduced a number of dictionaries in support of their position that "king size" is descriptive. One of the dictionaries introduced, Webster's Third New International Dictionary (1966), defines the words "king size" as "longer than the regular or standard size, . . . much larger in size than is usual for a particular class of things: OVERSIZE. . . ." Refer to Finding 39. The 1975 edition of the Oxford Illustrated Dictionary similarly defines the term "king size" as larger than standard size. Refer to Finding 39. Excerpts from ten additional dictionaries provided similar definitions. Refer to Finding 39. Illustrative of the dictionary definition of "king size", defendants introduced a number of consumer products which contained the term "king size" to indicate that the particular product was larger than normal size. Refer to Finding 38. Consequently, it is readily apparent that the term "king size" implies larger than normal or larger than the standard size.

In addition to the dictionary definition, the Fifth Circuit has recognized another indicator of whether a term is descriptive: "the extent to which it has been used in the trade names of others offering a similar service or product." *Vision Center v. Opticks, Inc., supra,* at 117. Although evidence was introduced indicating that the large men wearing apparel industry generally uses the terms "Tall and Big" or "Big and Tall" in their names, Refer to Finding 36, the term "king size" has in the past and is presently being used in the corporate names of a number of retailers selling large men's wearing apparel. Refer to Finding 36. In addition, a number of retailers and manufacturers, and even plaintiffs themselves, use "king size" to describe men's wearing apparel and shoes in larger than normal sizes. Refer to Findings 36, 37. This third party use of "king size" is probative of the descriptiveness of the mark "king size". *Amstar Corp. v. Domino's Pizza Inc.,* 615 F.2d 252, 260 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66

L.Ed.2d 129 (1980); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir.), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979); *Vision Center v. Opticks, Inc., supra*, at 117 ("[A]nother barometer of the descriptiveness vel non of a particular name is the extent to which it has been used in the trade names of others offering a similar . . . product."); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra*, at 13; *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 448 (5th Cir. 1973). On the basis of the above analysis, the Court concludes that the term "king size" is descriptive, as such term is indicative of larger than normal size products or, as in the instant cause, shoes and wearing apparel for larger than average size men.

### B. *Secondary Meaning*

4. As the Court has concluded that the mark "king size" is descriptive, the Court's inquiry is directed now to whether "king size" has acquired secondary meaning.[14] *See Vision Center v. Opticks, Inc., supra*, at 118.

■ In order to establish secondary meaning, the "[plaintiffs] must show more than a subordinate meaning which applies to it. [Plaintiffs] must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *see also Vision Center v. Opticks, Inc., supra*, at 118; *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra*, at 12. Because the Court has concluded that the mark "king size" is descriptive, *see* Conclusion 3, plaintiffs bear a high degree of proof. *Vision*

*Center v. Opticks, Inc., supra*, at 118. *See also* 1 J. Thomas McCarthy, *supra*, § 15:11, at 540–41. The evidentiary onus placed on plaintiffs in this regard has been described as "substantial where the proposed mark's original or primary meaning suggests the basic nature of the [product] to be [sold]." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra*, at 12. *See Vision Center v. Opticks, Inc., supra*, at 118. *See also* 3 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* § 77.3, at 359 (3d ed. 1969).

■ Secondary meaning can be established by direct or circumstantial evidence. Variables to be considered in determining whether a mark has acquired secondary meaning include: (1) length of time and manner of its use; (2) the nature and extent of its use; and (3) the efforts made in the direction of promoting a conscious connection in the public's mind between the mark and a particular source of origin. *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 478 (5th Cir. 1974); 3 R. Callman, *supra*, § 77.3, at 359. "In determining whether a word or . . . has acquired secondary meaning, the crucial issue is not the effort which was made to create it but the effectiveness of that effort," *Id.* at 360, and "[t]he chief inquiry is the attitude of the consumer toward the mark: does it denote to him a 'single thing coming from a single source'?" *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 849 (5th Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970), citing, *Coca-Cola Co. v. Koke Co. of America*, 254 U.S. 143, 146, 41 S.Ct. 113, 114, 65 L.Ed. 189 (1920). *See also Vision Center v. Opticks, Inc., supra*, at 119; *American Heritage Life*

---

14. The doctrine of secondary meaning and its ramifications were explained succinctly in *Liberty Mut. Ins. Co. v. Liberty Ins. Co. of Texas*, 185 F.Supp. 895, 903 (E.D.Ark.1960):

There are certain names, marks, and symbols which in their primary sense are merely generic or descriptive and do not ordinarily indicate the origin of goods or services. Such names, marks, or symbols, when used in their primary sense, cannot form the subject matter of a trade or service mark. However, a name, mark, or symbol by long and

exclusive use and advertising by one person in the sale of his goods and services may become so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others. When such an association exists, the name, mark, or symbol is said to have acquired a "secondary meaning," in which the original user has a property right which equity will protect against unfair appropriation by a competitor.

*Ins. Co. v. Heritage Life Ins. Co., supra,* at 12; *Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794 at 802 (9th Cir. 1970). The importance of direct evidence of public recognition in the form of surveys or similar evidence has been stressed by several courts. *Vision Center v. Opticks, Inc., supra,* at 119; *Aloe Creme Laboratories, Inc. v. Milsan, Inc., supra,* at 849.

5. During the trial of the case *sub judice,* a considerable amount of evidence was introduced by which King-Size sought to establish inferentially the state of the public mind. Plaintiffs have used the mark "king size" in their corporate names since 1947. Refer to Findings 7, 23. *See,* however, *Vision Center v. Opticks, Inc., supra,* at 119 (" '[C]ourts have summarily rejected claims of secondary meaning predicated solely upon the continued use of the mark for many years.' "), citing, 3 R. Callmann, *supra,* § 77.3. During this time, plaintiffs have increased their advertising budget from $5,300 in 1947 to $875,500 in 1977; it was estimated at trial that $970,000 would be spent in 1981 to advertise their business of selling wearing apparel for larger than normal size men to the American consumer. Refer to Findings 9, 32. Plaintiffs' advertisements have appeared in magazines with a nationwide circulation in cities throughout the country. Refer to Finding 33. Plaintiffs have placed advertisements also in the yellow pages of telephone books of large metropolitan cities, and to a limited extent, plaintiffs have advertised on television and radio. Refer to Finding 33. Due to the nature of plaintiffs' business, plaintiffs' marketing efforts include the promotion of their products through mail order catalogs which are mailed to plaintiffs' customers and potential customers. Refer to Finding 33. Although the sums spent on advertising, its scope, nature and duration are all factors that aid the Court in determining the presence of secondary meaning, "it must be remembered that the question is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of ["king size"] to the consuming public." *Aloe Creme Laboratories, Inc. v. Milsan, Inc., supra,* at 850 (emphasis in original).

In the instant cause, plaintiffs did not introduce direct evidence of consumer awareness of the significance of "king size" in the form of an objective survey. Rather, the direct evidence upon which plaintiffs relied were six of its customers residing in the Houston area which plaintiffs called as witnesses. Each of these witnesses testified that he or she associated the words "king size" with plaintiffs. Refer to Finding 41. There was no evidence that these six witnesses were representative of customers and potential customers of King-Size.

In rebuttal to King-Size's evidence, Frank introduced circumstantial evidence indicating that the term "king size" has been used in the past or is presently being used by other retailers of wearing apparel for larger than normal size men. Refer to Finding 36. "This lack of exclusivity in the use of the [term "king size"] in the [large men wearing apparel] industry is a factor militating against a finding of secondary meaning in [King-Size's] use of the [term]." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra,* at 13; *Carter-Wallace, Inc. v. Procter & Gamble Co., supra,* at 802.

■ In contradiction also to plaintiffs' evidentiary showing of secondary meaning, defendants introduced a survey conducted in Houston and Dallas. Refer to Findings 43–46. Since it would be impossible and impractical to bring every potentially confused consumer into court and have these consumers testify, a survey can be highly probative on the issue of secondary meaning. 2 J. Thomas McCarthy, *supra,* § 32:46, at 498–500. The probative value of the survey is dependent upon the survey being prepared fairly and its results directed to the relevant issues.

In the Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351 (1960), the Judicial Conference of the United States has listed several factors important to a court's assessment of a survey. The Judicial Conference recommends that the proponent of the survey establish the following:

that the proper universe was examined, that a representative sample was drawn from that universe, and that the mode of questioning the interviewees was correct. [The proponent] should be required to show that: the persons conducting the survey were recognized experts; the data gathered was accurately reported; the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; the sample design and the interviews were conducted independently of the attorneys; and the interviewers, trained in this field, had no knowledge of the litigation or the purposes for which the survey was to be used.

*Id.,* at 429 (footnotes omitted). The use of these factors in considering the probative value of survey evidence offered in a trademark infringement case was approved by the Fifth Circuit in *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 264. For a general discussion of the use of public surveys or polls as evidence, *see* Annot. 76 A.L.R.2d 623 (1961).

█ The first step in reviewing a survey is to determine whether the proper universe was selected and examined. The Fifth Circuit has stated that "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 264. *See also, American Basketball Assoc. v. AMF Voit, Inc.,* 358 F.Supp. 981, 986 (S.D.N.Y.), *aff'd,* 487 F.2d 1393 (2d Cir. 1973), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974); 2 J. Thomas McCarthy, *supra,* § 32:47, at 500 ("The universe is that segment of the population whose characteristics are relevant to the mental associations at issue.") (footnote omitted).

█ Upon reviewing the survey in light of the first factor, the Court concludes that serious and fatal errors exist in the survey universe selected by defendants' expert.

Defendants' universe which is composed of men who are 6'2" in height or over is far too narrow to give a fair indication of whether the consumers of wearing apparel for large size men do not associate the term "king size" with plaintiffs. Aside from the fact that only approximately one-third of those men interviewed were consumers in the relevant market, Refer to Finding 46, the survey excluded other groups of consumers of wearing apparel for large size men, *i.e.,* short, heavy men, men ranging in height from 6' to 6'2" with an unusual anatomical feature which requires them to purchase extra-large size clothes, and finally, women in families where such women are the principal purchasers of the product. Refer to Finding 35.

In addition to the aforementioned deficiency, there are further problems with defendants' sample from the Houston area. The Houston sample is comprised of men in only the central and eastern parts of Houston, Refer to Finding 44, and excludes customers from the southern and western sections of Houston; plaintiffs' retail store is located in the southwestern area of Houston. Refer to Finding 22. While the Court declines to fault the survey for not restricting the geographical area of the survey to a prescribed radius around plaintiffs' store, Refer to Finding 22, *see Sears, Roebuck & Co. v. Allstate Driving School, Inc.,* 301 F.Supp. 4, 18–19 (E.D.N.Y.1969), the survey universe is nevertheless defective for failing to include the entire Houston area, or at the very least, to include the area around plaintiffs' store. Since the survey failed to examine the proper universe, the survey must be discounted in its entirety, *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 507 (5th Cir. 1980); *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 264, and inquiry into the integrity of the methodology is unnecessary.

█ After reviewing carefully the evidence submitted by plaintiffs and defendants on the issue of secondary meaning, the Court concludes in light of the relevant law that plaintiffs have failed to demonstrate "that in the minds of the consuming public

the *primary* significance of the term ["king size"] is 'not the product but the producer.' " *Vision Ctr. v. Opticks, Inc., supra,* at 119.

## C. Likelihood of Confusion

6. Assuming arguendo that plaintiffs had been able to demonstrate that "king size" had acquired a secondary meaning, the Court concludes that defendants would nevertheless prevail on the ultimate issue of infringement.

 The Lanham Act, 15 U.S.C. § 1051 *et seq.,* provides that no person shall, without the consent of the registrant, use in commerce any registered mark if "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (1963). It is well established that "[t]he governing standard in trademark infringement actions is 'likelihood of confusion.' " *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 189 (5th Cir. 1981). *See also* 15 U.S.C. § 1114(1) (1963); *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.,* 676 F.2d 1079, 1082 (5th Cir. 1982); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* supra at 703 (5th Cir. 1981); *Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 314 (5th Cir. 1981); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc., supra,* at 504; *Soweco, Inc. v. Shell Oil Co., supra,* at 1185; *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 258–259. In other words, "[a] trademark is infringed if use of the allegedly infringing mark is likely to cause confusion or mistake, or to deceive purchasers or users as to the source, endorsement, affiliation or sponsorship of the product." *Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 770 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). *See also Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.,* 676 F.2d 1079, 1082; *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 388 (5th Cir. 1977); *Roto-Rooter Corp. v. O'Neal,* 513 F.2d 44, 45 (5th Cir. 1975). In regards to this issue, the Court's focus is upon the product's typical buyer.[15] *Armstrong Cork Co. v. World Carpets, Inc., supra,* at 500 n.5; *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., supra,* at 369, n.26; *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n,* 532 F.Supp. 1376, 1385 (S.D.Tex. 1982), and the cases cited therein. *See also McLean v. Fleming,* 96 U.S. 245, 251, 24 L.Ed. 828 (1878).

 It is not necessary for the plaintiffs to prove actual confusion. Rather, the principal inquiry is likelihood of confusion. *Control Components, Inc. v. Valtek, Inc., supra,* at 770; *Roto-Rooter Corp. v. O'Neal, supra,* at 45; *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857 (5th Cir. 1967); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 159 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). "Actual confusion is, however, strong proof that the likelihood of confusion exists. Moreover, 'while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.' " *Soweco, Inc. v. Shell Oil Co., supra,* at 1186, citing, *World Carpets, Inc. v. Dick Littrell's New World Carpets, supra,* at 489.

 In order to determine whether there is likelihood of confusion in a trademark infringement case, the Court must look to an amalgam of factors. Those factors include: "The type of trademark at issue; similarity of design; similarity of product; identity of retail outlet and purchasers; identity of advertising media utilized; [defendants'] intent; and actual confusion." *Roto-Rooter Corp. v. O'Neal, supra,* at 45. *See also Safeway Stores, Inc. v. Safeway Discount Drugs, supra,* at 1164;

---

**15.** The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying the class of goods, is the touchstone. 3 R. Callmann, *supra,* p. 33, § 81.2, at 577 (3d ed.) (footnotes omitted).

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., supra,* at 703; *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc., supra,* at 189; *Sun Banks of Florida v. Sun Fed. Sav. & Loan Ass'n, supra,* at 314; *Control Components, Inc. v. Valtek, Inc., supra,* at 770; *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n, supra,* at 1384.

### (1) *The Type of Trademark at Issue*

The first factor to be considered is the type of the mark involved since "the strength and distinctiveness of [plaintiffs'] mark is a vital consideration in determining the scope of protection it should be accorded. 'Strong marks [arbitrary, fanciful] are widely protected, as contrasted to weak marks [descriptive or generic].' " *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 259, quoting, J. R. Lunsford, *Trademark Basics,* 59 Trade-Mark Rep. 873, 878 (1969). *See also Safeway Stores, Inc. v. Safeway Discount Drugs, supra,* at 1164; *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir. 1979). ("The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.") (citations omitted). Without further discussion, the Court concludes on the basis of its prior analysis in this regard that the mark "king size" is descriptive and thus a weak mark. Refer to Conclusion 3.

### (2) *Similarity of Design*

7. "The similarity of design test has been described as nothing more than a subjective eyeball test. The similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the mark." *Exxon Corp. v. Texas Motor Exchange of Houston, Inc., supra,* at 505 (citations omitted); *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 260–61, *quoting* Restatement of Torts § 729, comment b (1938). Based upon a comparison of the overall effect of the respective marks, the Court concludes that a degree of similarity exists between plaintiffs' and defendants' mark due to the incorporation of the term "king size" in their respective corporate names. This degree of similarity is diminished, however, as the term "king size" is not employed as prominently and is not of the same size, as the word "Frank's" in defendants' corporate names. Refer to Finding 26. On the other hand, "king size" is the most distinctive feature of plaintiffs' corporate name and is displayed prominently on their signs, clothing labels, letterhead, and advertisements. Refer to Findings 23, 33. " 'The setting in which a designation is used affects its appearance and colors the impression conveyed by it.' " *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 261, *quoting* Restatement of Torts § 29, comment b (1938). Accordingly, although a degree of similarity exists between the two marks, the prominence of the word "Frank's" in defendants' corporate names and the relative weakness of mark "king size" reduces the similarity to the extent that the Court is unable to conclude the two marks are confusingly similar.

### (3) *Similarity of Product*

8. Generally, "[t]he greater the similarity between the products and services [provided by plaintiffs and defendants], the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exchange of Houston, Inc., supra,* at 505. The class of the parties goods, i.e., clothing for large size men, is the same. The Court considers this factor indicative, though not dispositive, of the issue of likelihood of confusion.

### (4) *Identity of Retail Outlet and Purchasers*

9. Identity of retail outlets and purchasers is the fourth factor to be considered by the Court in its determination of likelihood of confusion. Dissimilarities between the retail outlets for and the predominant consumers of [plaintiffs'] and [defendants'] products lessens the possibility of confusion, mistake or deception. *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 262.

Upon reviewing the evidence in light of this factor, the Court concludes that this factor weighs in favor of a finding of likeli-

hood of confusion. Although a substantial share of plaintiffs' business is conducted through its mail order catalogs, Refer to Finding 19, plaintiffs do maintain a retail store in Houston to sell large size men's clothes. Refer to Finding 22. Defendants, however, restrict their marketing efforts to the retail stores that are operated throughout Texas. Refer to Finding 25. It is undisputed that the composition of plaintiffs' and defendants' customers, large size men and women in families where such women are the purchasers of the product, Refer to Finding 35, are the same. Nevertheless, this factor is insufficient to sustain a finding of likelihood of confusion in view of the restricted range of protection to which plaintiffs' mark is entitled.

### (5) Similarity of Advertising Media Utilized

10. From 1947 to the present, plaintiffs have employed a variety of local and national advertising media to promote their product including magazines, newspaper, the yellow pages of telephone books, limited radio and television, and mail order catalogs. Refer to Finding 33. Besides those magazines with nationwide circulation that may be distributed in Texas, and the mail order catalogs that are sent to consumers in Texas by plaintiffs, they also advertise in newspapers in Dallas and Houston. Refer to Finding 33. Defendants, on the other hand, limit their advertising to the areas in Texas where their stores are located. The various advertising utilized by defendants in these localities include newspapers; in Houston where defendants advertise in The Houston Post and The Houston Chronicle, and in Dallas where defendants utilize the Dallas News, as well as use of the yellow pages of the telephone book in both cities. Refer to Finding 34.

Upon comparing the advertising media utilized by the parties, it is evident that some similarity exists. In Houston, both plaintiffs and defendants employ The Houston Post and The Houston Chronicle and the yellow pages of the Houston directory. In Dallas, both advertise in the Dallas News. Refer to Finding 33. Unlike defendants' more limited advertising, however, plaintiffs employ a national advertising campaign, e.g., magazines with nationwide circulations, and more directly, a mail order catalog program. Refer to Finding 33. Accordingly, there is a considerable dissimilarity between the forms and intensity of the advertising used to promote the parties' respective products. Because of the limited degree of similarity between advertising media used by the parties, this factor is only slightly indicative of likelihood of confusion. Exxon Corp. v. Texas Motor Exchange of Houston, Inc., supra, at 506 ("The greater degree of similarity in the campaigns, the greater the likelihood of confusion.").

### (6) Defendants' Intent

11. The sixth factor to be considered is defendants' intent to deceive purchasers. "[I]f . . . [plaintiffs] can show that [defendants] adopted a mark with the intent of depriving benefit from the reputation of the [plaintiffs], that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" Exxon Corp. v. Texas Motor Exchange of Houston, Inc., supra, at 506. See also Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., supra, at 703–04; Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n, supra, at 318–19. ("That a latecomer adopts another's name or mark, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for any court"); Amstar Corp. v. Domino's Pizza, Inc., supra, at 263.

It is evident from the record that defendants chose the term "king size" because it was descriptive of wearing apparel for large size men. Refer to Finding 27. Defendants knew of its use in the industry as descriptive of clothing for large size men and did not know that anyone possessed the exclusive right to use the term. Refer to Finding 27. Their purpose in adopting and using the term was not to trade off or derive benefit from plaintiffs' good will or reputation. Refer to Finding 27. Hence, the Court concludes that this factor weighs against a finding of likelihood of confusion.

## (7) *Actual Confusion*

12. Although the factors discussed above may be used to circumstantially establish likelihood of confusion, "[t]he best evidence of likelihood of confusion is provided by evidence of actual confusion." *Exxon Corp. v. Texas Motor Exchange of Houston, Inc., supra,* at 505.

King-Size sought to demonstrate actual confusion by introducing testimony from four of its customers who testified that they had entered a retail store which incorporated the words "king size" in its name. The retail store was identified as being located on the corner of Westheimer and Voss in Houston. Refer to Finding 41. The store did not belong to defendants. Refer to Finding 41. The evidence which plaintiffs introduced addressing the issue of actual confusion between themselves and Frank was very limited. Specifically, plaintiffs offered testimony from one of its customers who stated that at one time he thought that defendants' Houston store was associated with plaintiffs. Refer to Finding 42. Another one of plaintiffs' witnesses testified, however, that he had never associated plaintiffs with defendants' Houston store, Refer to Finding 41, while yet another one of plaintiffs' customers stated that she was not sure if she ever confused defendants' Houston store with plaintiffs. Refer to Finding 42.

Despite the absence of evidence that these four witnesses were representative of plaintiffs' customers, these isolated instances of confusion between plaintiffs and a store not owned by defendants demonstrate, if anything, the absence rather than the existence of actual confusion. The same conclusion is reached by the Court with respect to the solitary customer of plaintiffs who testified to his confused association between plaintiffs' and defendants' Houston store, especially when one of plaintiffs own witnesses testified to the contrary. Refer to Finding 42.[16]

In addition to the paucity of evidence of lack of actual confusion, defendant Winker testified that he was not aware of any instances of confusion between his businesses and that of plaintiffs since defendants' first retail store opened in 1972. Refer to Finding 47. Nor had any of defendants' store managers reported any instances of confusion to defendant Winker, although the managers were instructed to do so. Refer to Finding 48.

13. After carefully reviewing the aforementioned factors as a whole in light of the record, the Court concludes that defendants' use of the term "king size" is not likely to cause confusion, mistake or deception "as to the source, endorsement, affiliation or sponsorship of the product."

## II. *False Designation of Origin*

14. Plaintiffs allege that defendants' use of "king size" in its corporate names in connection with the sale of wearing apparel for large men constitutes a false designation of origin of goods in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982).

Section 43(a) provides in pertinent part:

(a) Any person who shall use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into

16. As mentioned in the body of the Court's Findings of Fact and Conclusions of Law, plaintiffs introduced only extremely limited evidence of actual confusion. Plaintiffs did not present to the Court a survey or any other direct evidence of actual confusion. The Court views these omissions of proof as both suspect and significant. As one court, confronted with a similar lack of proof, stated:

not a single salesperson or retailer was called to testify as to confusion on his or her part or that he or she knew of a single instance of consumer confusion. This omission is underscored by the fact that defendant is a substantial corporation with the means to have undertaken either a survey or an investigation to establish instances of actual consumer confusion.

*Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* at 1231.

commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982). This section creates a limited cause of action for unfair competition that is, in certain respects, broader than the trademark infringement provisions of the Lanham Act, 15 U.S.C. §§ 1114–24.[17] In comparing the two causes of action, one commentator has stated:

> The emphasis and thrust of trademark protection and registration is in the direction of deciding whether an alleged symbol in fact functions to identify and distinguish the goods or services of one seller. For registration purposes, this is the basic issue. In trademark infringement litigation . . . the next step is to compare what has been determined to be a mark with that usage by another which is alleged to cause a likelihood of confusion. In trademark law, therefore, it is only the exclusive symbol characterized as a 'trademark' which is juxtaposed against another's usage to determine whether or not the two uses by two sellers is likely to confuse customers.
>
> On the other hand, unfair competition law is not so limited in scope. The court need not focus on merely one aspect of plaintiff's total selling 'image', as in trademark law. Liability for unfair competition can result from the buyer's likely confusion between two products or services based upon the total impact of all

aspects of the parties' selling efforts. In unfair competition, every facet of the parties' selling program is relevant—from the symbols, letters, pictures, colors, shapes and sizes connected with the products to the advertising representations made. In unfair competition, everything that is likely to have an impact upon the purchaser is relevant to the ultimate determination of whether there is probable 'unfairness' or confusion by those purchasers.

1 J. Thomas McCarthy, *supra*, § 2:2, at 45 (footnotes omitted). *See also Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., supra,* at 702.

As a general rule, the same facts which support a claim for trademark infringement or common law unfair competition will support an action under section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1982). *See New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979); *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Hence, as the Court has already addressed the issues of secondary meaning and the concomitant likelihood of confusion as to the term "king size", it is unnecessary to conduct a similar examination here. Accordingly, consistent with the Court's earlier conclusions that plaintiffs are unable to establish that the term "king size" has acquired a secondary meaning and that "defendants [are] passing off [their] goods . . . as those of the [plaintiffs] by virtue of substantial similarity between the two, leading to confusion on the part of customers. . . '", *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., supra,* at 703, quoting *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc., supra,* at 192,[18] the Court concludes that plaintiffs' false designation of origin claim must fail.

---

**17.** The intent of the Lanham Act is set forth in section 45 as follows: "The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce . . . [and] to protect persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127 (1982).

**18.** The Court reaches this conclusion despite the fact that the scope of inquiry into similarity of design, one of the factors utilized in a deter-

*See Amstar Corp. v. Domino's Pizza, Inc., supra,* at 265.

### III. *Fair Use Defense*

█ 15. Assuming arguendo once again that the Court had concluded that plaintiffs' use of "King Size" had acquired secondary meaning with the purchasing public, defendants assert that they are nevertheless not liable for trademark infringement by reason of the fair use defense pursuant to 15 U.S.C. § 1115(b)(4) (1982).[19] Defendants' establishment of the fair use defense defeats not only a claim for trademark infringement, but also plaintiffs' claim of unfair competition pursuant to 15 U.S.C. § 1125(a) (1982). *Robert B. Vance & Assocs., Inc. v. Baronet Corp.,* 487 F.Supp. 790, 797 (N.D.Ga.1979). *See also* 1 J. Thomas McCarthy, *supra,* § 11:17, at 379. The provision upon which defendants rely provides a defense to an infringement action if

> the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, ... or of a term or device which is descriptive of and used fairly in good faith only to describe to users the goods or services of such party, or their geographic origin....

15 U.S.C. § 1115(b)(4) (1982). *See Soweco, Inc. v. Shell Oil Co., supra,* at 1185; *Venetianaire Corp. of America v. A & P Import Co.,* 429 F.2d 1079, 1081–82 (2d Cir. 1970). *See* generally 3 Callman, *supra,* § 85.1(b). Defendants have the burden of establishing this defense. *Jockey International, Inc. v. Burkard,* 185 U.S.P.Q. 201 (S.D.Cal.1975); *Philip Morris, Inc. v. Imperial Tobacco Co., Ltd.,* 251 F.Supp. 362, 379 (E.D.Va.1965), *aff'd,* 401 F.2d 179 (4th Cir. 1968), *cert. denied,* 393 U.S. 1094, 89 S.Ct. 875, 21 L.Ed.2d 784 (1969).

█ In reviewing an assertion of the fair use defense in this action, the Court must focus on the " '*use* of the words, not on their nature or meaning in the abstract.' (emphasis in original). When a plaintiff has chosen a mark with some descriptive qualities, he cannot altogether exclude some kinds of competing uses even when the mark is properly on the register...." *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at 12–13. *See also Soweco, Inc. v. Shell Oil Co., supra,* at 1185 ("The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods.").

█ 16. Having concluded earlier that "king size" is a descriptive term, see Conclusion 3, the Court turns now to the question of whether defendants' use of the descriptive term "king size" was the use of the term as a trademark, or was rather a fair and good-faith use of the term in a descriptive manner. After careful consideration, the Court concludes that the more credible evidence substantiates defendants' assertion that they used the term "king size" not as a trademark, but in a descriptive manner as a means of conveying the nature of goods that defendants were selling—wearing apparel for large size men. Refer to Finding 27. Consequently, defendants' fair use of "king size" as a descriptive term serves to defeat plaintiffs' claim for trademark infringement, and for unfair competition under 15 U.S.C. § 1125(a)(1982).

### IV. *Unfair Competition—Texas Common Law*

17. A cause of action for unfair competition is premised upon common law and

---

mination of likelihood of confusion, is considerably broader. *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 703 (5th Cir. 1981); *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 192 (5th Cir. 1981).

**19.** Although it has been recognized that technically the fair use defense applies only in actions in which infringement of an incontestable mark

is alleged, it has been recognized also that the defense, because it is restatement of the common law defense, is available in defense of a contestable mark by virtue of 15 U.S.C. § 1115(a) (1982). *M. B. H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d 50, 52 n.2 (7th Cir. 1980); *Schmid Laboratories v. Youngs Drug Products, Corp.,* 482 F.Supp. 14, 20 (D.N.J.1979).

"governed by the law of the state wherein the cause of action arises." [20] *Oliver Gintel, Inc. v. Koslow's, Inc.,* 355 F.Supp. 236, 239 (N.D.Tex.1973); *see also General Adjustment Bureau, Inc. v. Fuess,* 192 F.Supp. 542, 547 (S.D.Tex.1961). The tort of unfair competition has been described as a

> form of unlawful business injury which consists essentially, in the passing off or attempting to pass off on the public, the goods or business of one person as and for the business of another, or in the conduct of a trade or business in such a manner that there is either an expressed or implied representation to that effect....
>
> [N]o one has a right to avail himself of another's favorable reputation in order to sell his own goods. The law has a threefold object in unfair competition cases: (1) To protect the honest trader in business which fairly belongs to him. (2) To punish the dishonest trader who is taking his competitor's business away by unfair means. (3) To protect the public from deception.
>
> The doctrine of unfair competition is based upon the principle of common business integrity....
>
> ... A competitor may not use a name, whether fictitious or real, or a description, whether or not true which is intended or calculated to represent to the world that his business is that of another, and by such fraudulent misstatements deprive the latter of business which would otherwise come to him.

*Oliver Gintel, Inc. v. Koslow's, Inc., supra,* at 239, citing, 87 C.J.S. Trademarks Trade-Names and Unfair Competition §§ 13–14, 89 (1969).

 In order to prevail on a claim of unfair competition, plaintiffs bear the burden of establishing that its use of "king size" had acquired a secondary meaning in

Texas or that "king size" is distinctive. *Douglas v. Taylor,* 497 S.W.2d 308, 310 (Tex.Civ.App.—Houston [1st. Dist.] 1973, no writ). *See also Soweco, Inc. v. Shell Oil Co., supra,* at 1190. Plaintiffs must also demonstrate that the public is likely to be confused or deceived. *Douglas v. Taylor, supra,* at 310; *Harrelson v. Wright,* 339 S.W.2d 712, 714–15 (Tex.Civ.App.—Eastland 1960, writ ref.); *McCarley v. Welch,* 170 S.W.2d 330, 332 (Tex.Civ.App.—Dallas 1943, no writ). *See also Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., supra,* at 706; *Soweco, Inc. v. Shell Oil Co., supra,* at 1191; *National Bank of Commerce v. Shaklee Corp.,* 503 F.Supp. 533, 541–42 (W.D.Tex.1980). It is not necessary, however, that plaintiffs prove intent to deceive. *Soweco, Inc. v. Shell Oil Co., supra,* at 1191; *National Bank of Commerce v. Shaklee Corp., supra,* at 541–42. Once again, on the basis of the Court's earlier conclusions that the term "king size" is descriptive and that plaintiffs failed to prove that "king size" had acquired a secondary meaning and is likely to lead to confusion, the Court denies plaintiffs' claim for unfair competition under principles of Texas common law.

### V. *Cancellation of Plaintiffs' Registrations*

#### A. *Fraud on the Patent & Trademark Office*

18. Defendants assert that plaintiffs engaged in fraudulent and inequitable conduct in the procurement of their federal service mark and trademark registrations. This allegation forms the basis for defendants' counterclaims for cancellation of plaintiffs' federal registrations, defense of unclean hands and prayer for attorneys' fees and damages pursuant to 15 U.S.C. §§ 1119, 1120 (1982).[21] Specifically, defendants assert that despite King-Size's

---

**20.** This Court has jurisdiction over the common law unfair competition claim by reason of the joinder of such claim with a substantial and related claim under the trademark laws. See 28 U.S.C. § 1338(b) (1976).

**21.** "Fraud in the procurement of a trademark registration may be raised in a number of pro-

cedural contexts [such as]: ... a ground for cancellation in civil litigation; ... the basis for a defense of unclean hands; ... the basis of a civil action for damages for false or fraudulent registration...." 2 J. Thomas McCarthy, *supra,* § 31:21, at 406–07 (footnotes omitted).

knowledge of numerous other users of the term "king size" at the time King-Size filed its applications for registration, King-Size's president James Kelley fraudulently averred that to the best of his knowledge, no other person, firm, corporation or association had the right to use the term "king size".

Generally, in order to prevail on a claim of fraud in the procurement of a registration, a proponent must plead and prove: "(1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false ('scienter'); (3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; (5) damage proximately resulting from such reliance." *Robert B. Vance & Assocs., Inc. v. Baronet Corp., supra,* at 800, citing, Prosser, Law of Torts § 105 (4th ed. 1971). Defendants bear a heavy burden in proving fraud in the procurement of the registrations. *W. D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.,* 377 F.2d 1001, 1003 (C.C.P.A.1967); *Robert B. Vance & Assocs., Inc. v. Baronet Corp., supra,* at 800.

In order to prevail on their claim for cancellation, defendants must establish that the registration was obtained fraudulently. As mentioned earlier, defendants' allegation of fraud is predicated upon alleged fraudulent misrepresentations in plaintiffs' sworn declaration as to their ownership of the mark "king size" and as to the rights of others to use the mark. Consequently, defendants bear the onus of establishing "that at the time of the [applications] for registration, ... [plaintiffs] knew that others *had the right to use* and were using the [term 'king size' as a trade name]." *Bart Schwartz International Textiles, Ltd. v. F. T. C.,* 48 Cust. & Pat.App. 933, 289 F.2d 665, 669 (1961) (emphasis added). In this regard, it is not sufficient to prove that plaintiffs failed to disclose that others were using the mark if plaintiffs did not believe that such third-parties had that right. *King Automotive, Inc. v. Speedy Muffler King,* 667 F.2d 1008, 1011 n.4 (Cust.

& Pat.App.1981); *American Security Bank v. American Security and Trust Co.,* 571 F.2d 564, 568 (C.C.P.A.1978); *Bart Schwartz International Textiles, Ltd. v. F. T. C., supra,* at 669; *Acme Valve & Fitting Co. v. Wayne,* 386 F.Supp. 1162, 1169 (S.D. Tex.1974); *Wurzburger Hofbrau Aktiengesellschaft v. Schoenling Brewing Co.,* 331 F.Supp. 497, 505 (S.D.Ohio 1971), aff'd, 175 U.S.P.Q. 391 (6th Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972) ("[T]he specific requirement of the statute (15 U.S.C. § 1051) is not a disclosure of use, but a disclosure of use by those having 'the right to use' ....."). *See also* 2 J. Thomas McCarthy, *supra,* § 31:21 at 411 ("[T]he Lanham Act requires an applicant to state that no other person, to the best of his knowledge, has the *right* to use the mark. It does not require [an] applicant to disclose anyone who may be in fact using the mark, but does not possess the right to use the mark.") (emphasis in original).

19. On the basis of the record before it, the Court is unable to conclude that King-Size's president's statements in the registration applications that King-Size was the owner of the mark "king size" and "to the best of his knowledge, no other person, firm, corporation, or association has the right to use [the mark 'king size'] in commerce," was fraudulently made. Rather, the Court is of the opinion that such statements were made with the good faith belief that King-Size did possess the exclusive right to use "king size" in connection with the business of selling wearing apparel for larger than normal size men. Refer to Finding 29. King-Size has long asserted its exclusive right to use the term "king size" by reason of its use of the term since 1946 and its extensive promotional activities. Refer to Finding 23. Also at the time of the execution of the applications, King-Size had vigorously enforced their asserted exclusive right to use the mark "king size" by informing third party users of its claim as such users came to King-Size's attention. Refer to Finding 24. In addition, King-Size had commenced trademark litigation against third-party users. Refer to Find-

ings 24, 29. Moreover, assuming arguendo that King-Size's statement regarding the exclusive right to use "king size" had been false when made, this does not require a finding that the statement was fraudulent since defendants were unable to prove that plaintiffs knew or had reason to know that the representation was false. Refer to Finding 29. See *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at 14; *Robert B. Vance & Assocs., Inc. v. Baronet Corp., supra,* at 800; *The Five Platters, Inc. v. Purdie,* 419 F.Supp. 372, 384 (D.Md.1976); *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.,* 339 F.Supp. 973, 983–84 (M.D.Tenn. 1971), *aff'd,* 470 F.2d 975 (6th Cir. 1972); *Travelodge Corp. v. Siragusa,* 228 F.Supp. 238, 243 (N.D.Ala.1964), *aff'd,* 352 F.2d 516 (5th Cir. 1964). "Statements of honest, but perhaps incorrect, belief or innocently inaccurate statements of fact are insufficient as are knowing misstatements which would have a *de minimis* effect on the validity of the service mark." *The Five Platters, Inc. v. Purdie, supra,* at 384; *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co., supra,* at 983–84; *De Mert & Dougherty, Inc. v. Chesebrough-Pond's, Inc.,* 348 F.Supp. 1194, 1197 (N.D.Ill.1972); *Wrist-Rocket Mfg. Co. v. Saunders,* 379 F.Supp. 902, 921–22 (D.Neb.1974), *aff'd in part, rev'd in part on other grounds,* 516 F.2d 846 (8th Cir.), *cert. denied,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975). Accordingly, the Court concludes that defendants have failed to sustain their burden of proving fraud to warrant cancellation of the federal registrations.[22] The Court concludes further that as a result of defendants' failure to prove fraud, defendants' claim for damages and attorneys' fees and their unclean hands defense must fail also.

**22.** Defendants have introduced evidence reflecting that King-Size filed two applications for registration of the term "king size" with the United States Patent and Trademark Office in 1964, and abandoned the applications in 1965. Plaintiffs' Exhibits 36, 37; Defendants' Exhibit 99. Unfortunately for both the defendants and the Court, the evidence does not reveal the reasons why the applications were abandoned. King-Size has not produced copies of the abandoned applications and apparently lacks sufficient information to enlighten the interested parties as to the cause of the applications'

**B. Is "King Size" a Common Descriptive Name of an Article or Substance?**

20. Defendants also seek cancellation of King-Size's federal registrations on the basis that the mark "king size" is not distinctive. Pursuant to 15 U.S.C. § 1064(c) (1963), a trademark may be cancelled if "at any time [it] becomes the common descriptive name of an article or substance...." See *Anti-Monopoly, Inc. v. General Mills Fun Group, supra,* at 301; *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at 13; *American Heritage Life Ins. Co. v. Heritage Life Ins. Co., supra,* at 13–14. "Courts equate common descriptive name, as used in the statute, with the shorthand expression 'generic term.'" *Anti-Monopoly, Inc. v. General Mills Fun Group, supra,* at 301. *See also* Conclusion 2 n.5. On the basis of the Court's prior conclusion that the mark "king size" is descriptive of men's clothing for large men and not generic as defined previously by this Court, the Court is unable to comply with defendants' request and cancel King-Size's federal registrations.

**C. Cancellation of Plaintiffs' Texas Trademark Registration**

21. Finally, defendants seek cancellation of King-Size's state registration pursuant to Tex.Bus. & Com.Code § 16.16 (Vernon 1968), asserting the same basis as alleged by defendants in their counterclaim for cancellation of defendants' federal registration, that is, that "king size" is descriptive. This Court can cancel King-Size's state trademark registration if defendants can establish that King-Size's "registered

demise. Defendants state in their Post Trial Memorandum that the Patent and Trademark Office does not retain abandoned applications and their attempts to obtain copies of the applications from King-Size have been fruitless; apparently King-Size contends that such applications have been lost. Although defendants' argue that an inference favorable to their cause should be drawn from King-Size's failure to explain the fate of their initial registration applications, the Court is unable to draw such an inference or conclusion.

mark has become incapable of serving as a mark." Tex.Bus. & Com.Code § 16.-16(a)(4)(E) (Vernon 1968). *See also* Tex. Bus. & Com.Code § 16.25 (Vernon 1968).

Although it is required that a federally registered mark be generic before such mark can be cancelled, the Texas case law cited by defendants and reviewed by the Court indicates that a term cannot be appropriated as a trademark in Texas if the term is generic, *Radam v. Capital Microbe Destroyer Co.,* 81 Tex. 122, 16 S.W. 990, 993 (1891), or descriptive of the character, quality, or composition of an article. *Alff v. Radam,* 77 Tex. 530, 14 S.W. 164, 164 (1890) ("[A] generic name, or a name descriptive of an article of trade, of its qualities, ingredients, or its characteristics, [cannot] be employed as a trade-mark and the exclusive use of it be entitled to legal protection."). *See also Dixiepig Corp. v. Pig Stand Co.,* 31 S.W.2d 325, 327 (Tex.Civ.App.—Dallas 1930), *cert. denied,* 283 U.S. 831, 51 S.Ct. 364, 75 L.Ed. 1443 (1931). Accordingly, consistent with the Court's earlier conclusion that "king size" as applied to men's wearing apparel describes a characteristic of the wearing apparel, that is, the size of the clothing, the Court orders that King-Size's Texas trademark registration be cancelled as "the registered mark has become incapable of serving as a mark."

## VI. *Conclusion*

In summation, as plaintiffs have failed to establish that the mark "king size", a mark which the Court concludes to be descriptive, has acquired secondary meaning or that defendants use of the term "king size" was likely to cause confusion, the Court concludes that defendants have not infringed plaintiffs' mark or falsely designated the origin of their goods. In addition, the Court concludes that defendants have not engaged in unfair competition under the principles of Texas common law. The Court concludes further that as plaintiffs' federal registrations were not procured through fraud and as plaintiffs' mark is not a common descriptive name of an article or substance, defendants claim for cancellation of plaintiffs' federal registrations must be denied. The Court concludes, however, that as plaintiffs' mark is descriptive of clothing for large size men, plaintiffs' state registration must be cancelled.

In the event that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

Counsel for defendants is hereby directed to submit a Final Judgment incorporating by reference the foregoing Findings of Fact and Conclusions of Law within twenty (20) days hereafter.